In re Application of the PRESIDENT'S COMMISSION ON ORGANIZED CRIME.

Subpoena of Lorenzo SCADUTO, Appellant.

No. 85–5232.

United States Court of Appeals, Eleventh Circuit.

May 29, 1985.

Benedict P. Kuehne, Jon A. Sale, Bierman, Sonnett, Shohat & Sale, P.A., Miami, Fla., Ronald P. Fischetti, Fischetti, Feigus & Pomerantz, Warren L. Feldman, Anne C. Feigus, New York City, for appellant.

Jonathan Rusch, Chief Counsel, President's Com'n on Organized Crime, Washington, D.C., Stanley Marcus, U.S. Atty., Linda Collins-Hertz, Asst. U.S. Atty., Miami, Fla., for appellee.

Before RONEY, FAY and JOHNSON, Circuit Judges.

FAY and JOHNSON, Circuit Judges:

This appeal raises a number of important questions regarding the composition and powers of the President's Commission on Organized Crime (the "Commission"). It arises from an order of the United States District Court for the Southern District of Florida, holding appellant Scaduto in contempt for his failure to testify before the

Commission. On appeal, Scaduto raises the following issues: 1) whether the appointment of two Article III judges and two members of Congress to the Commission violated the separation of powers doctrine; 2) whether appellant validly invoked his Fifth Amendment privilege against self-incrimination as a consequence of a reasonable fear of foreign prosecution; 3) whether the immunity conferred upon appellant was invalid because of its approval by an Acting Assistant Attorney General in place of the Attorney General; 4) whether the application for a writ of habeas corpus ad testificandum by an Assistant United States Attorney instead of the Attorney General violated P.L. 98–368, Section 3; 5) whether the district court erred in holding the civil contempt statute, 28 U.S.C.A. § 1826, applicable to the instant proceeding.

## I. BACKGROUND

On July 28, 1983, President Reagan issued Executive Order 12435, which established the Commission, in accordance with the provisions of the Federal Advisory Committee Act ("FACA"), as amended, 5 U.S.C.A. app. 2, Sections 1–15. Section 2(a) of Executive Order 12435 directed the Commission to:

> make a full and complete national and region-by-region analysis of organized crime; define the nature of traditional organized crime as well as emerging organized crime groups, the sources and amounts of organized crime's income, and the uses to which organized crime puts its income; develop indepth information on the participants in organized crime networks; ... evaluate Federal laws pertinent to the effort to combat organized crime[;] ... advise the President and the Attorney General with respect to findings and actions which can be undertaken to improve law enforcement efforts directed against organized crime[;] and make recommendations concerning appropriate administrative and legislative improvements and improvements in the administration of justice.

Exec. Order 12435, Section 2(a), 48 Fed. Reg. 34,723 (1983).

The Commission is composed of nineteen members, including the Honorable Irving R. Kaufman, a Judge of the United States Court of Appeals for the Second Circuit; the Honorable Potter Stewart, a retired Associate Justice of the United States Supreme Court; the Honorable Strom Thurmond, a member of the United States Senate; the Honorable Peter Rodino, Jr., a member of the United States House of Representatives; and other persons with broad experience in law enforcement and criminal justice. Pursuant to section 1(b) of Executive Order 12435, which directs that "[t]he President shall designate a Chairman from among the members of the Commission," President Reagan designated Judge Kaufman as Chairman.

To enable the Commission to fulfill its responsibilities under Executive Order 12435, Congress passed Pub.Law No. 98–368, 98 Stat. 490 (1984), which conferred a variety of powers in aid of the Commission's mandate to investigate and report on organized crime. Under Public Law 98–368, the Commission may hold public hearings; issue subpoenas requiring attendance and testimony of witnesses and the production of information; seek writs of habeas corpus ad testificandum and enforcement of its subpoenas, "upon application by the Attorney General," in federal courts; issue orders compelling testimony under the federal immunity statute, 18 U.S.C.A. Sections 6001–05; obtain access to and use information obtained pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), as amended, 18 U.S.C.A. Sections 2510–20; and obtain other types of information through measures consistent with the terms of Executive Order 12435. P.L. 98–368, Sections 1–4, 6(b), 98 Stat. 490, 490–93 (1984).

On February 5, 1985, the Commission issued a subpoena for appellant Scaduto, a federal prisoner confined at the United States Penitentiary at Terre Haute, Indiana. Scaduto is currently serving a sixty-four year term of imprisonment imposed on

November 21, 1984, in the United States District Court for the Eastern District of New York, following his conviction for various violations of the Drug Act. The appeal of his conviction is now pending in the United States Court of Appeals for the Second Circuit; oral argument of Scaduto's appeal was heard on March 25, 1985. Judge Kaufman did not serve on the panel which heard Scaduto's appeal. However, the appeal is presently under submission to the court upon which Judge Kaufman serves as an active circuit judge.

In response to a petition by the Commission through the United States Attorney for the Southern District of Florida, to secure Scaduto's presence at public hearings before the Commission on February 20–21, 1985, in Miami, United States District Judge Joe Eaton issued a writ of habeas corpus ad testificandum.

On February 19, 1985, appellant filed a motion to quash the subpoena and writ of habeas corpus ad testificandum, and a complaint for declaratory and injunctive relief, in the Southern District of Florida. The complaint challenged, *inter alia*, the constitutionality of the Commission under the separation of powers doctrine, and the authority of the Commission to compel appellant's testimony in light of his alleged fear of foreign prosecution in Italy.

On February 20, 1985, United States District Judge William M. Hoeveler denied Scaduto's motions and ordered him to testify before the Commission *in camera* or at a private deposition. Judge Hoeveler further ordered that the transcript of appellant's testimony be sealed, and that no one other than the parties have access to it. The court's order specifically prohibited disclosure, either direct or indirect, to any foreign sovereign, including the Italian government. In conformity with that order, counsel for the Commission conducted a deposition, at which appellant was served with an authorized compulsion order, is-

sued pursuant to P.L. 98–368 and 18 U.S.C.A. Sections 6001–05. Scaduto nonetheless continued, through his counsel, to assert a Fifth Amendment privilege.

On the evening of February 20, 1985, the Commission moved to compel appellant's testimony. Early on the morning of February 21, 1985, a hearing was held on that motion before Judge Hoeveler. At that hearing, Judge Hoeveler signed an order compelling Scaduto to testify, under the same conditions earlier specified. At Judge Hoeveler's direction, counsel for the Commission immediately conducted a second deposition of Scaduto in conformity with the court's order. In that deposition, appellant persisted in refusing to answer the Commission's questions, again asserting a privilege against self-incrimination, notwithstanding the judicial and Commission orders issued in connection with the deposition.

After his refusal to testify, appellant was again brought before Judge Hoeveler. Upon review of the record and upon the Commission's motion, Judge Hoeveler orally held Scaduto in contempt, pursuant to 28 U.S.C.A. § 1826. On February 22, 1985, Judge Hoeveler issued a written order of commitment under 28 U.S.C.A. § 1826.

## II. ISSUES AND DISCUSSION

### A. Separation of Powers

Appellant argues first that the composition of the Commission, which includes two United States Congressmen and two Article III Federal Judges, violates the constitutionally required separation of powers, and renders all action by the Commission void. He contends that the performance by members of the legislature and the judiciary of those executive "law enforcement" activities authorized by P.L. 98–368, which include subpoenaing witnesses and reviewing information intercepted by electronic surveillance, violates the separation of powers.[1]

---

**1.** Appellant also suggests that the President lacks power to appoint federal judges and legislators to an executive advisory commission. This claim has little merit. Those cases dealing with the appointments (or removal) power, which are considered to be a subset of the separation of powers cases, have addressed two types of problems: 1) whether a member of one

The tripartite structure established by the Constitution reflects the conferral of separate and distinct powers on the President, the Congress and the Judiciary. The framers of our Constitution embraced "Montesquieu's view that the maintenance of independence as between the legislative, the executive and the judicial branches," was essential to the preservation of liberty. *Myers v. United States,* 272 U.S. 52, 116, 47 S.Ct. 21, 25, 71 L.Ed. 160 (1926). Thus the departments of government were organized on the principle that "[t]he accumulation of all powers legislative, executive and judiciary in the same hands, whether of one, a few or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny." *Immigration and Naturalization Service v. Chadha,* 462 U.S. 919, 960, 103 S.Ct. 2764, 2789, 77 L.Ed.2d 317 (1983) (Powell, J., concurring in judgment) (*quoting The Federalist* No. 47, at 324 (J. Madison) (J. Cook ed. 1961)).

This understanding of the separation of powers doctrine has not, however, required that the three departments of government remain absolutely independent or "hermetically sealed" from one another. *Nixon v. Administrator of General Services,* 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977); *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). Indeed, the appearance of administrative agencies which combine functions characteristically associated with two or more of the departments of government demonstrates the potential for legitimate interaction or interdependence among the powers of government. *See Buckley v. Valeo,* 424

U.S. 1, 280–81, 96 S.Ct. 612, 755–56, 46 L.Ed.2d 659 (1976) (opinion of White, J.); *Humphrey's Executor v. United States,* 295 U.S. 602, 628–30, 55 S.Ct. 869, 874–75, 79 L.Ed. 1611 (1935). What the separation of powers has been construed to prohibit is those arrogations of power to one branch of government which "disrupt[ ] the proper balance between the coordinate branches," *Nixon v. Administrator of General Services,* 433 U.S. at 443, 97 S.Ct. at 2790, or "prevent[ ] [one of the branches] from accomplishing its constitutionally assigned functions," *id.* (citing *United States v. Nixon,* 418 U.S. at 711–12, 94 S.Ct. at 3109–10). A minority view of the doctrine has also reflected the more structural, Madisonian concern that one branch should not be permitted to share in the most substantial powers of another. *See Reid v. Covert,* 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (act giving President power to alter substantive law violates separation of powers).

Few cases have considered the extent to which members of the judicial or legislative branches may exercise powers traditionally associated with another branch. Two early cases, *Hayburn's Case,* 2 U.S. (2 Dal.) 408, 1 L.Ed. 436 (1792), and *United States v. Ferreira,* 54 U.S. (13 How.) 43, 14 L.Ed. 42 (1851), addressed the question of whether courts could exercise powers which were non-judicial in nature. *Hayburn's Case* concerned a statute which vested in the courts of appeals the power to settle pension claims of widows, orphans and invalids, subject to revision by the Secretary of War and the Congress. The law was amended before judgment, rendering the

branch (usually the President) has the power to appoint (or remove) an official whose duties partake of the powers of a branch of which the appointing official is not a member, *see Humphrey's Executor v. United States, supra,* and 2) whether members of one branch who have already appointed an official may add to his responsibilities duties partaking of the power of another branch, *see Springer v. Government of Philippine Islands,* 277 U.S. 189, 48 S.Ct. 480, 72 L.Ed. 845 (1928) (under Phillipine analogue of U.S. Constitution, legislature may not accord executive duties to legislative appointees without violating executive appointments power).

As is readily apparent, neither of these fact patterns is present in the instant case. That the powers of the Commission are substantially executive is the very point which is being advanced by Scaduto in the second part of his argument; thus there appears to be no problem with officials who are to exercise such powers being appointed by the President. And that the legislature confers executive powers on the Commission through P.L. 93–368 presents no problem under cases such as *Springer,* as it was the President, rather than the legislature, who appointed the commissioners in the first place.

issue moot, but the Court included in its opinion the opinions of three circuit courts which had protested the act or refused to adjudicate claims under it. In these opinions, jurists such as Jay and Iredell concluded that the act violated the separation of powers by requiring of judicial officers the performance of a task which formed no part of the courts' Article III powers, and by subjecting judgments rendered by members of the judicial branch to revision by officials of the legislative or executive branch. In *United States v. Ferreira*, the Court addressed an appeal under a statute which directed the United States District Court for the Northern District of Florida to adjudicate injury claims arising from United States action against Spanish officers and inhabitants of Florida, subject to approval or revision by the Secretary of the Treasury. Citing *Hayburn's Case* in support of the fact that the task imposed by the statute was not of a judicial nature, the Court dismissed the appeal for lack of jurisdiction. It expressed no opinion, however, as to whether the act violated the separation of powers.[2]

*Hobson v. Hansen*, 265 F.Supp. 902 (D.D.C.1967) (three judge court), examined a question more directly related to the instant case: the extent to which judges, acting as individuals rather than as members of a court, may undertake the performance of non-judicial duties. *Hobson* involved a challenge to a D.C. statute requiring that members of the Board of Education be appointed by United States District Court judges for the District of Columbia. The court upheld the constitution-

ality of the provision on the basis of two provisions inapplicable to the instant case,[3] but it also undertook a general examination of federal judicial power to perform non-judicial duties which is instructive. The majority was unable to identify a categorical prohibition, analogous to the "case and controversy" requirement, on the official engagement of federal judges in non-judicial duties.[4] The court stressed, however, that absence of any categorical constraint on individual judges, should not be understood to imply that they are free to pursue whatever non-judicial activities they wish. Judges are constrained by the limitations of propriety, by the requirement that their non-judicial duties not have "such incongruity" with the judicial function as would void the judicial power which had been conferred, *see Ex Parte Siebold*, 100 U.S. (10 Otto) 371, 25 L.Ed. 717 (1879), and by the "guarantees of personal liberty" which are confered upon citizens and potential litigants. 265 F.Supp. at 915. These limitations derive both from Article III and from the Fifth and Fourteenth Amendments to the Constitution.

While they are in some respects factually distinct from the instant case, these cases offer strong support for the proposition that conferring non-judicial functions on members of the judiciary may raise separation of powers problems. *Hobson* demonstrates, more importantly, that the way to resolve the question in the individual case is to apply a functional standard similar to that propounded in *Nixon v. Administrator of General Service, supra:* does the imposition of powers traditionally associat-

---

**2.** In *Chandler v. Judicial Council for the Tenth Circuit,* 398 U.S. 74, 90 S.Ct. 1648, 26 L.Ed.2d 100 (1970), the Court had a similar opportunity to determine whether Council action was judicial action. While the Court suggested that Council action was not judicial action, 398 U.S. at 88 n. 10, 90 S.Ct. at 1655 n. 10, the Court declined to resolve the matter as it found that the petitioner had not exhausted his administrative remedies and was not entitled to extraordinary relief. Once again, the separation of powers issue was not addressed.

**3.** The *Hobson* court relied on Article I, Section 8, cl. 17, which permits Congress to confer on

the federal courts of the District of Columbia powers beyond those described in Article III, and Article II, Section 2, cl. 2, which permits Congress to vest in the Courts of Law the power to appoint "inferior Officers" of the United States.

**4.** This point is aptly illustrated by the actions of John Jay as Chief Justice of the Supreme Court. While Jay declined to give advisory opinions to President Washington, he saw no constitutional bar to his service as American negotiator with England of the treaty that bears his name. *See Hobson v. Hansen, supra,* 265 F.Supp. at 915.

ed with one branch of government on officials of another branch interfere with their ability to perform their constitutionally-required duties in the branch of which they are a part?

■ Under this functional standard, it appears that the imposition of the Commission's investigatory powers on members of Congress does not interfere with their ability to perform their constitutionally required duties.[5] If their investigatory activities cause them to believe that the government is losing its "war" on organized crime, or to take a negative view of the methods being used by law enforcement officials combat it, this would not appear to interfere with their ability to perform as legislators: their office does not require them to approach such subjects with impartiality. Moreover, while such investigatory powers are essentially executive in character, they are not beyond the congressional purview; many congressional committees are given investigatory powers to aid them in advisory tasks, see *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725 (D.C.Cir.1974) (Senate Committee granted subpoena power for purposes of investigation) and this has not been construed to threaten their ability to perform as legislators.[6]

A different conclusion must be reached with respect to those members who are also federal judges. Impartiality is one of the central, constitutionally-ordained, requirements of the federal judicial office,

see *United States v. Will*, 449 U.S. 200, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980), and this impartiality is threatened by many of the activities of the Commission. A judge who is charged with assisting and improving enforcement efforts against organized crime must adopt a pro-government perspective which is ill-suited to his obligation to be neutral in the courtroom. The kind of information he might uncover through the investigatory activities of the Commission would further endanger his impartiality. If the data and testimony surveyed by the Commission were to demonstrate, for example, that the magnitude of the threat posed by organized crime was greater than had previously been suspected, that a substantial amount of organized crime activity was never prosecuted, or that law enforcement officials in many parts of the country employed methods which were poorly chosen, subject to abuse or inadequate to combat the problem, such discoveries could affect the way the judge approached those organized crime suspects and law enforcement officials in cases who appeared before him. Moreover, even if a judge could satisfy himself that he could separate his participation on the Commission from his judicial functions, it is not clear that litigants could sustain equal faith in his impartiality. As Judge Wright observed in *Hobson v. Hansen, supra:*

> The need to preserve judicial integrity is more than just a matter of judges satisfying themselves that the environment in which they work is sufficiently free of

---

5. One constitutional provision which might appear at first glance to bear upon the power of congressmen to undertake executive functions is the "incompatibility clause," Article I, Section 6, cl. 2, which prohibits members of Congress from holding certain federal offices during their elected terms. *Cf. Signorelli v. Evans*, 637 F.2d 853 (2d Cir.1980) (New York analogue of incompatibility clause requiring state judges to resign before running for congressional office constitutional). But the language of this provision, "No Senator or Representative shall ... be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been increased during such time ...," suggests that it applies to appointments for which congressmen receive pay. Members of the Com-

mission receive no pay for their work. Executive Order 12435, Section 3(b).

6. While it is not the case that the Article III duties of federal judges include investigatory activities of the kind which may be undertaken by the Commission, judges have served on presidential advisory committees which have enjoyed similar powers. The Warren Commission on the Assassination of President Kennedy, which was headed by Chief Justice Earl Warren, for example, was empowered to subpoena witnesses and seek judicial enforcement of its subpoenas. There appears, however, to have been no previous challenge to the composition and powers of an executive advisory committee on separation of powers grounds.

interference to enable them to administer the law honorably and efficiently. Litigants and our citizenry in general must also be satisfied.

265 F.Supp. at 931 (Wright, J., dissenting). These problems would seem to bear particularly on the participation of Judge Kaufman, who is both the Chairman of the Commission and an active judge in a jurisdiction which has a well-publicized problem with organized crime, but the attitudinal hazards which Commission membership presents apply to Justice Stewart as well. Under the functional test propounded in the *Nixon* cases, the conferral of such powers on federal judges violates the separation of powers.

### B. Fifth Amendment Privilege and the Danger of Foreign Prosecution

Scaduto argues next that he was justified in asserting his Fifth Amendment privilege because the domestic immunity which had been conferred upon him was insufficient to protect him from foreign prosecution. On September 14, 1984, an Italian magistrate and policeman came to the United States to interrogate Scaduto. At the time of the interrogation, which took place at the office of the United States Attorney for the Eastern District of New York, the magistrate presented Scaduto with a series of drug trafficking charges and informed him that there was an outstanding warrant for his arrest in Italy. The issuance of such a warrant is the first step in the commencement of extradition proceedings by the Italian government. At the September 1984 meeting with the Italian officials, Scaduto stated that his appeal was pending in the United States and exercised his right to remain silent. On January 26, 1985, the State Department formally denied an extradition request by the Italian government.

In *Zicarelli v. New Jersey State Commission of Investigation*, 406 U.S. 472, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972), the Court declined to resolve a similar claim, but held that a claimant asserting that a Fifth Amendment privilege is necessary to protect him from the threat of foreign prosecution must demonstrate first, that the information that would be disclosed through his testimony might incriminate him under foreign law, and second, that his fear of foreign prosecution is "real and substantial" rather than merely speculative. 406 U.S. 478–80, 92 S.Ct. 1674–76. Courts of appeals, including the former Fifth Circuit, have followed these standards in evaluating similar claims. *See United States v. Brummitt*, 665 F.2d 521 (5th Cir.1981), *cert. denied*, 456 U.S. 977, 102 S.Ct. 2244, 72 L.Ed.2d 852 (1982); *In Re Tierney*, 465 F.2d 806 (5th Cir.1972), *cert. denied*, 410 U.S. 914, 93 S.Ct. 959, 35 L.Ed.2d 276 (1973); *In Re Flanagan*, 691 F.2d 116 (2d Cir.1982). The courts have identified a number of factors which bear upon the second prong of the *Zicarelli* test, which include: whether there is an existing or potential foreign prosecution of the claimant; whether any of the charges would entitle the foreign jurisdiction to have him extradited; and whether there is a likelihood that his testimony would be disclosed to a foreign government. *Zicarelli v. New Jersey State Commission of Investigation, supra; In Re Flanagan, supra*, 691 F.2d at 121.

Neither party disputes the fact that the testimony sought by the Commission would be relevant to a foreign prosecution. Several of the questions posed by the Commission at Scaduto's depositions concerned his involvement in drug traffic between the United States and Italy, which involvement would surely have been of interest to Italian authorities. The issue which the parties contest is whether there was a "real and substantial danger" of an Italian prosecution, under the standards set forth above.

The Commission argues that despite the fact that charges have been filed by the Italian government, extradition is currently impossible under Article 6 of the Extradition Treaty which states that

> Extradition shall not be granted when the person sought has been convicted, acquitted or pardoned, or has served the sentence imposed, by the requested party

for the acts for which extradition is requested

and notes that an extradition request has already been denied by the State Department. The Commission also claims that there is virtually no likelihood that Scaduto's testimony would become available to foreign authorities, because the court's order required Scaduto's testimony to be given in the form of a deposition taken by a single Commission attorney, and imposed an absolute bar on any form of disclosure. Scaduto argues that if his conviction were reversed on the appeal currently pending before the Second Circuit, and retrial was not sought, he could again be subject to extradition. He argues that it is also possible that the Italian authorities could try him *in absentia*. Scaduto further claims that some courts have found secrecy orders insufficient to assure that testimony will not become available to a foreign sovereign. *See In re Flanagan, supra,* 691 F.2d at 123 (Rule 6(e) of F.R.Crim.P. not adequate to assure nondisclosure of testimony).

■ The Commission's argument has greater support on all points. While it is possible that Scaduto's conviction will be reversed, *and* retrial will not be sought, *and* the Italian authorities will seek extradition, *and* U.S. authorities will comply, such a danger appears to be of precisely that speculative variety that the Court found insufficient to support the assertion of a privilege in *Zicarelli*. And Scaduto presents no evidence to suggest that he will, in fact, be tried *in absentia*, or that such a trial will have any consequences whatsoever for him if he is not subject to extradition. As to the sufficiency of the court's secrecy order, the former Fifth Circuit has found Rule 6(e) fully adequate to prevent the likelihood of disclosure to a foreign sovereign. *See United States v. Brummitt, supra,* 665 F.2d at 526; *In Re Tierney,* 465 F.2d at 811–12. By analogy, it would appear that the order given by the court is sufficient to ·eliminate the danger of such disclosure, particularly as the officers of the court who would be involved in the taking of Scaduto's deposition would be

less likely to "leak" information in the manner feared by the *Flanagan* court than members of a grand jury. The district court did not err in finding that there was insufficient danger of a foreign prosecution to justify the assertion of the privilege.

C. Failure of Attorney General to Approve the Application for Immunity

■ The immunity order presented by the Commission prior to the taking of Scaduto's first deposition was not approved by the Attorney General but by an Acting Assistant Attorney General of the Criminal Division. Scaduto argues that this delegation was improper because 18 U.S.C.A. § 6004(a) (proceedings before administrative bodies), provides only for the approval of applications for immunity by the Attorney General. He claims that because the immunity granted was therefore invalid, he was justified in invoking the Fifth Amendment privilege.

The Commission argues the fact that Section 6004 has no explicit language permitting delegation (while Section 6003 (proceedings before a court or grand jury) explicitly permits delegation to the Deputy Attorney General or any designated Assistant Attorney General) does not demonstrate that such delegation is prohibited. It argues that this general language permits the Attorney General to make whatever delegation he deems appropriate, under the broad power conferred on him by 28 U.S.C.A. § 510 (delegation of authority). The Commission argues further that two delegation orders promulgated under this statutory authority render the delegation in the instant case valid: 28 C.F.R. 0.175(c), which provides that Assistant Attorneys General are

authorized to exercise the authority vested in the Attorney General by Section 6004 ... to approve the issuance by an agency of the United States of an order compelling testimony by a witness in a proceeding before the agency when the subject matter of the proceeding is within the cognizance of their respective divisions ... provided however, that no ap-

proval shall be granted unless the Criminal Division indicated that it has no objection to the proposed grant of immunity

and 28 C.F.R. 0.178(a), which provides that Assistant Attorneys General may redelegate their authority under 28 C.F.R. 0.175 to their respective Deputy Assistant Attorneys General during times when they are absent.

Although there appears to be no binding precedent on this point, several well-reasoned opinions have employed analysis virtually identical to that advanced by the Commission. In *Federal Trade Commission v. Foucha*, 356 F.Supp. 21 (N.D.Ala. 1973), the court found the language of Section 6004 indicative of Congressional intent to permit delegation at the discretion of the Attorney General, pursuant to 28 U.S.C.A. § 510. As the Attorney General had exercised this authority by enacting 28 C.F.R. 0.175 and 0.178, the court applied these orders to uphold the delegation (to an Assistant Attorney General of the Antitrust Division) in that case. The court also held that where a violation of such regulations is alleged, the claimant must demonstrate prejudice in order to invalidate action taken pursuant to them. 356 F.Supp. at 25. *See also In Re Horn*, 458 F.2d 468 (3rd Cir. 1972) (applying analysis to similar language in Section 2514); *December 1968 Grand Jury v. United States*, 420 F.2d 1201 (7th Cir.), *cert. denied*, 397 U.S. 1021, 90 S.Ct. 1260, 25 L.Ed.2d 531 (1970) (applying similar analysis to Section 6004). Thus it seems clear that the delegation in the instant case was consistent with the regulatory scheme of which Section 6004 is a part. Moreover, even if a departure from the terms of the applicable regulations could be shown, Scaduto has demonstrated no prejudice arising from it, *see Foucha, supra* 356 F.Supp. at 25; *Pacific Molasses Co. v. Federal Trade Commission*, 356 F.2d 386 (5th Cir.1966). The district court did not err in finding the grant of immunity valid.

### D. Failure of Attorney General to Make Application for Habeas Corpus Ad Testificandum

Scaduto argues next that the writ of habeas corpus ad testificandum should be quashed, and the contempt order vacated, because the application for the writ by an Assistant United States Attorney rather than the Attorney General violates the terms of P.L. 98–368, Section 3. This section provides that

A court of the United States within the jurisdiction in which testimony of a person held in custody is sought by the Commission ... may, upon application by the Attorney General, issue a writ of habeas corpus ad testificandum requiring the custodian to produce such person before the Commission or before a member of the Commission....

The Commission argues that 28 U.S.C.A. § 510 confers on the Attorney General broad power to delegate his authority, and that absent clear statutory language or history demonstrating an intent to supercede that section, such authority to delegate should be respected.

The case law, once again, supports the Commission's position. Section 510 is presumed to control delegation by the Attorney General, unless the statutory provision in question explicitly supercedes it, *see United States v. Cuomo*, 525 F.2d 1285 (5th Cir.1976); *United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). The language of the provision in no way suggests that it was intended to supercede or narrow the power conferred in Section 510, *compare with United States v. Giordano, supra* (language of Section 2516 explicitly narrows Attorney General's power of delegation), and the pertinent legislative history reflects an attitude of deference toward Section 510. Under regulations promulgated pursuant to 28 U.S.C.A. § 510, the Attorney General may delegate his power to Assistant and Deputy Assistant Attorneys General, who may then delegate it to United States Attorneys, who may in turn delegate it to Assistant United States Attorneys, *see* 28 C.F.R. 0.57; 28

U.S.C.A. § 542; *United States v. Cuomo, supra; United States v. Smyth,* 104 F.Supp. 283 (D.C.Cal.1952). Moreover, Scaduto demonstrates no prejudice arising from the alleged failure to conform to the regulatory scheme. *See F.T.C. v. Foucha, supra; Pacific Molasses Co. v. F.T.C., supra.* The district court did not err in failing to quash the writ of habeas corpus ad testificandum on grounds of improper delegation.

### E. Applicability of Civil Contempt Statute

■ Scaduto argues finally that the civil contempt statute, 28 U.S.C.A. § 1826, is not applicable to the instant case. He claims that, by its terms, Section 1826 applies only to witnesses who "refuse[ ] without cause to testify in any proceeding before or ancillary to" a federal court or grand jury, and the instant proceeding before the Commission is not "before or ancillary to" a court or grand jury. This claim is without merit. Because the Commission was obliged to secure Scaduto's testimony by writ of habeas corpus, and by enforcement of an immunity order, and because Scaduto took legal action to protect himself from the Commission's subpoena, the proceedings before the Commission became "ancillary" to proceedings before a court. Such a relationship is, moreover, specifically contemplated by P.L. 98–368(b)(1), which provides that when a court issues an order requiring an individual to testify before the Commission, "failure to testify may be punished by the court as contempt thereof." Finally, Scaduto's interpretation conflicts with the documented intent of Congress to make Section 1826 applicable to a range of court-related proceedings, including depositions. *See* 1970 U.S.Code Cong. & Ad. News 4007, 4022. The district court did not err in holding Scaduto in civil contempt under Section 1826.

FAY, Circuit Judge, writing separately:

### III. Severability

■ Having concluded that the membership of the Article III judges on the Commission is improper, we must determine whether or not past actions by the Commission are void. There is no clear authority controlling this question. It seems to me that an appropriate analogy would be the approach taken in regard to statutes under review. Courts should refrain from invalidating more of a statute than is necessary. *Regan v. Time, Inc.,* — U.S. ——, 104 S.Ct. 3262, 3269, 82 L.Ed.2d 487 (1984). If the unconstitutional portion of a statute can be severed, the remaining portion should be upheld.

■ The Commission operates with the assistance of a staff. Its attorneys have appeared in this very matter. Hearings have been conducted throughout the country. It is assumed that much testimony has been obtained. Numerous subpoenas have probably been issued. The Commission is comprised of nineteen members. Although Judge Kaufman serves as the chairman, nothing in the record indicates that he personally or single-handedly makes decisions concerning the issuance of witness subpoenas or other writs of assistance. There is nothing about the presence of either Justice Stewart or Judge Kaufman which would infect or compromise in any way the work of the Commission. These judges may have disqualification problems in the future but such issues are not before us and can undoubtedly be handled with ease.

Alternatively, it seems to me the approach taken by the Supreme Court in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), would also be appropriate. One of the issues in that matter dealt with the appointing process for members of the Federal Election Commission. The Court concluded:

It is also our view that the Commission's inability to exercise certain powers because of the method by which its members have been selected should not affect the validity of the Commission's administrative actions and determinations to this date, including its administration of those provisions, upheld today, authorizing the public financing of federal elec-

tions. The past acts of the Commission are therefore accorded *de facto* validity, just as we have recognized should be the case with respect to legislative acts performed by legislators held to have been elected in accordance with an unconstitutional apportionment plan.

*Id.* at 693.

In my opinion, our holding regarding the separation of powers doctrine does not require the voiding of Commission action. The subpoena issued to the appellant is valid and the contempt order due to be affirmed.

RONEY, Circuit Judge, special concurrence:

I concur with Judge Fay's decision to affirm the district court's enforcement of the subpoena here in question. Although I agree that even if the Commission on Organized Crime is unconstitutionally constituted, its actions can be given *de facto* validity and the subpoena enforced, I disagree with the decision of Judges Fay and Johnson on the constitutional issue. In my judgment, the President's Commission on Organized Crime is not unconstitutionally constituted. The facts, legal proceedings and issues presented to this Court are carefully set out in the opinion of Judges Fay and Johnson, and need not be repeated here. Because I agree with their decision on the other arguments made by appellant to defeat the enforcement of this subpoena, I need only discuss the constitutionality of the Commission under the separation of powers concept.

The separation of powers doctrine, implicit in our tripartite form of Government, is not explicitly articulated in the Constitution. Nor are there any judicial decisions which have comprehensively dealt with the doctrine in the context here presented. Thus there are no well-defined principles to guide this separation of powers challenge.

The most that can be cited for authority is the discussion of the principles involved, only some of which is in judicial opinions. The great majority of that discussion, however, would clearly indicate the separation of powers principle does not inhibit Article III judges from undertaking nonjudicial governmental functions, even though that activity might well disqualify them from performing certain judicial duties.

Since the beginning of the Republic to modern times, Article III judges of stature have sometimes served the country in executive positions. John Jay served simultaneously as Chief Justice and as Ambassador to England. Oliver Ellsworth similarly served as Chief Justice and Minister to France. For a brief period in 1801, John Marshall served as Chief Justice and Secretary of State. Justice Roberts chaired the Commission investigating the Pearl Harbor disaster. Justice Jackson was Chief Counsel for the United States in the Nuremberg prosecution of Nazi war criminals. Chief Justice Warren headed the Commission appointed by the President to investigate President Kennedy's assassination. Slonim, *Extrajudicial Activities and the Principle of the Separation of Powers,* 47 Conn.B.J. 391 (1975). Since none of these assignments were challenged in court on constitutional grounds, no controlling precedent flows from them.

A specific proposal to prevent judges from performing extrajudicial activities was considered, however, and rejected at the Constitutional Convention. Charles Pinckney, a delegate from South Carolina, introduced a specific proposal barring "Judge[s] of the Supreme Court" from holding outside offices. His proposal was referred to the Commission of Detail and nothing more was heard of it. Slonim, 49 Conn.B.J. at 401.

Indeed, several statutes passed by Congress provide that the Chief Justice or other Article III judges serve governmental entities in a nonjudicial capacity. *See, e.g.,* 20 U.S.C.A. § 42 (Chief Justice member of Board of Regents of Smithsonian Institution); 20 U.S.C.A. § 72 (Chief Justice a Trustee of the National Gallery of Art); 20 U.S.C.A. § 76cc(b) (Chief Justice a Trustee of the Joseph H. Hirshhorn Museum and Sculpture Garden); 44 U.S.C.A. § 2501 (Chief Justice appoints member of judiciary

to National Historical Publications Commission).

In the only modern case to consider the problem of federal judges performing non-judicial tasks the court said:

> There is no constitutional principle that federal judges may not engage officially in nonjudicial duties. There is the constitutional principle that Article III courts may not engage in adjudicatory or decisional functions except in those "cases" and "controversies" referred to in Article III. The first Chief Justice of the United States illustrated the distinction. He led the Court in declining to give advisory opinions to President Washington; but a few years later when still Chief Justice he saw no constitutional objection to becoming the American negotiator with England of the important Jay treaty which bears his name. This was not without controversy, albeit in good part politically motivated. The Jay experience is mentioned simply as an outstanding illustration of the difference between functions which may not be required of Article III courts or their judges and functions of a nonjudicial character which are not barred by the Constitution.

*Hobson v. Hansen,* 265 F.Supp. 902, 915 (D.D.C.1967) (three judge court).

The two most often cited cases in any discussion of separation of powers are *Hayburn's Case,* 2 U.S. (2 Dall.) 408, 1 L.Ed. 436 (1792), and *United States v. Ferreira,* 54 U.S. (13 How.) 39, 14 L.Ed. 42 (1852). *Hayburn's Case* involved the 1792 Pensions Act which gave the courts of appeals authority to rule on the pension claims of disabled veterans, but subject to review by the Secretary of War. Congress amended the Act prior to judgment, rendering it moot, so the Supreme Court never ruled on the Act's constitutionality. But the reporter of the case included in a footnote the three circuit court opinions which found the Act unconstitutional.

The holdings in those opinions were that the separation of powers principle was violated by Congress' assigning to the "Court" nonjudicial functions. They disa-

greed on whether the judges could have performed the Pension Act duties as individual Commissioners. The members of the New York district thought they could, while those from North Carolina thought they could not. 2 U.S. at 411–12.

Chief Justice Taney alluded to this point in the course of deciding *United States v. Ferreira. Ferreira* dealt with a statute directing the district judge of the Northern District of Florida to examine the claims of Spanish citizens arising out of the 1819 peace treaty between the United States and Spain, subject to review by the Secretary of the Treasury. The Court held it did not have jurisdiction over the case as an appeal from the district court because "[t]he decision is not the judgment of a court of justice. It is the award of a commissioner." 54 U.S. at 47. The action of the district judge as a Commissioner was not invalidated nor did the Court expressly address that issue. Referring to *Hayburn's Case,* Taney said:

> the only question upon which there appears to have been any difference of opinion, was whether it might not be construed as conferring the power on the judges personally as commissioners. And if it would bear that construction, there seems to have been no doubt, at that time, but that they might constitutionally exercise it, and the Secretary constitutionally revise their decisions.

*Ferreira,* 54 U.S. (13 How.) at 49.

A note following the decision indicates Taney's approval of an unreported Supreme Court decision decided in 1794 entitled *United States v. Yale Todd,* which indicates such action would be valid.

The central argument in the case at issue is framed as a question of whether the Commission activity of the judicial members interferes with their ability to perform their constitutionally-required duties in the judicial branch. There is no suggestion that the judges involved would be completely disabled from their judicial duties, but only that they would be disqualified from handling cases involving the scope of the Commission activity. We need not decide precisely what disqualification, if any,

would in fact be appropriate to discern that this argument cannot control the decision. The well-known fact that judges frequently are disqualified from handling certain cases and that the judicial branch suffers no power dimunition therefrom simply supports a decision that the disqualifying action of an individual judge in an executive position does not create a separation of powers problem. The question is whether the powers of the executive, legislative, or the judicial branch of Government are in any way compromised by the composition and activities of this Commission. No argument has been made that they are diminished in any way. The structure of the judicial branch particularly, with its easy cross-assignability of judges of equal power undergirds the notion that the loss of one or two judges on particular cases does not infringe the constitutionally-required duty of the judiciary. 28 U.S.C.A. §§ 291, 292, 294.

Appellant argues that this Commission is an improper merging of the branches of Government. That assertion is made principally on the ground that members of the three branches are on the Commission. The short answer to this argument is that the congressional members of the Commission exercise no powers of Congress, and the judicial members no powers of the judiciary, in service on the Commission. Simply put: the judges do not wear their robes in the Commission room. This point is crisply made by the provision that to enforce subpoenas, the Commission must go to court. President's Commission on Organized Crime; Subpoena Power, P.L. 98–368, § 2(b)(1), 98 Stat. 490 (1984). It is reinforced by the provision that the judges' expenses are not paid from the judicial budget. Exec. Order 12435, Section 3(b), 48 Fed.Reg. 34, 723 (1983).

This analysis reveals the inappropriateness of attempting to adapt the functional standard of *Nixon v. Administrator of General Services*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977) to this case. *See United States v. Nixon*, 418 U.S. 683 (1974), 94 S.Ct. 3090, 41 L.Ed.2d 1039. The *Nixon* cases involved the issue of whether the exercise of judicial power encroached on the separate power of the executive. Since no judicial power is here exercised, except by the court that enforces this subpoena, the *Nixon* cases are inapposite.

The decision here does not detract from the dictum in *Buckley v. Valeo*, 424 U.S. 1, 123, 96 S.Ct. 612, 684, 46 L.Ed.2d 659 (1975) that:

> The Court has held that executive or administrative duties of a nonjudicial nature may not be imposed on judges holding office under Art. III of the Constitution. *United States v. Ferreira*, 13 How. 40 [14 L.Ed. 42] (1852); *Hayburn's Case*, 2 Dall. 409 [1 L.Ed. 436] (1792).

The issue is not whether the President or Congress could require the judicial and congressional officers here to serve on the Commission. There is nothing in this record to suggest that the members did not voluntarily accept the appointment. There is nothing in this decision to suggest that they could not have declined appointment, had they chosen to do so.

Although no assertion of the *Buckley* principle has been judicially tested, Presidents in recent years have frequently appointed both members of the Federal judiciary and members of Congress to commissions established to advise them on important issues of public policy. *See, e.g.*, Exec. Order 11412, 3 C.F.R. 726 (1966–1970 Comp.) (Presidential appointment of Judge A. Leon Higginbotham, Senators Philip A. Hart and Roman Hruska, and Representatives Hale Boggs and William M. McCulloch as members of National Commission on Causes and Prevention of Violence); Exec. Order 11236, 3 C.F.R. 329 (1964–1965 Comp.) (Presidential establishment of President's Commission on Law Enforcement and Administration of Justice, which included Judges James B. Parsons and Luther W. Youngdahl as members); Exec. Order 11130, 3 C.F.R. 795 (1959–1963 Comp.).

The general thrust of the argument as to unconstitutionality is that this Commission is a law enforcement agency engaged in

activities in which federal judges simply should not be involved. To point out the appellant's perception in this regard, the following portion of his brief is quoted:

> The Commission is not a mere study or reading group, or even an intellectual think tank. It is not studying a precise problem solely for the purpose of advising the public. It is a powerful investigative body whose actions impact greatly upon the three branches. Its powers are substantial and have the force of law. At its core, the Commission's stated goal and role is to fight crime. To succeed in its purpose, its members are classified as "investigative or law enforcement officers" (P.L. 98–368 6(a)(1) ) for the purposes of access to records and information. The Commission has apparent authority to compel testimony and even require the production of witnesses (P.L. 98–368, § 2). In all its functions, the Commission is answerable to the President, through the Attorney General (E.O. 12435, § 4), and obtains needed resources from the Attorney General (E.O. 12435, § 3(c) ). As it goes about accomplishing its goals, the Commission makes findings about organized crime, evaluates federal laws pertaining to organized crime, and even makes recommendations concerning administrative, legislative and judicial improvement (E.O. 12435, § 2(a) ).

By reason of the purpose and role of the Commission, the statutory interaction of the ordinarily separate branches of government are forced to work together in a manner which jeopardizes the Constitutionally mandated independence of each. A judge cannot be placed in a position of being a law enforcement officer answerable to the Attorney General. A judge cannot be called upon to investigate criminal activity and give advisory opinions regarding the effectiveness of the law enforcement effort against organized crime. A judge cannot be placed in a position of recommending legislative responses to emerging problems. Similarly, a congressional representative is ill-equipped, in a constitutional sense, to take on the role of a law enforcement officer or to utilize the tools available to the Executive to combat crime. It is not the function of the Congress to advise the Attorney General or the President how to utilize crime detection and prevention methods. Yet, the Commission compels its members to do all this and more.

Contrary to this argument, the Commission is simply to advise and recommend. It is to:

> advise the President and the Attorney General with respect to its findings and actions which can be undertaken to improve law enforcement efforts directed against organized crime, and make recommendations concerning appropriate administrative and legislative improvements and improvements in the administration of justice.

Exec. Order 12435, Section 2(a), 48 Fed. Reg. 34, 723 (1983). It has no autonomous authority to impose sanctions or implement final binding action. Although it has the power to investigate facts upon which to base its recommendations, it has no extraordinary powers not usually given to commissions appointed under the authority of the Federal Advisory Commission Act, 5 U.S.C.A.App. 2.

Although the analysis here makes it unnecessary to decide the propriety of federal judges serving on this Commission, it should be noted that it is not uncommon for federal judges to advise the executive and legislative branches of Government with respect to particular matters which fall within their expertise as a result of their judicial experience. In addition to the executive advisory commissions previously noted, judges frequently testify before Congress not only as to proposed rules in matters of judicial administration, but in other matters as well. *See, e.g., Reform of the Federal Criminal Laws: Hearings Before the Senate Committee on the Judiciary,* 97th Cong., 1st Sess. pt. XVI, at 11915–31 (testimony of Judge Gerald B. Tjoflat, United States Circuit Judge, Court of Appeals for the Eleventh Circuit); *Legislation to Revise and Recodify the Federal Crimi-*

*nal Laws: Hearings Before the Subcommittee on Criminal Justice of the House Committee on the Judiciary,* 95th Cong. 2d Sess., pt. 3, at 2473–84 (1978) (testimony of Judge Morris Lasker, United States District Judge, Southern District of New York).

Even if the Commission is determined to be unconstitutionally constituted, I agree with Judge Fay that its past action in the issuance of this subpoena should be given *de facto* validity, and the subpoena can be properly enforced, under the authority of *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) and *Northern Pipeline Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982).

Thus, I would affirm the judgment of the district court.

JOHNSON, Circuit Judge, dissenting in part:

Although I concur in Sections I and II of the majority's opinion, I must dissent from Section III, which holds the federal judges severable from the remainder of the Commission and affirms the judgment of the district court. While this approach may be appropriate when reviewing specific legislation, it is ill-suited to reviewing the composition of an executive advisory committee. The doctrine of "severance" propounded in *Regan v. Time,* — U.S. —, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984), reflects judicial deference to the enactments of Congress and to the legislative history of a particular statute, neither of which is applicable here. *Id.* at 3269–70. Moreover, severance is rendered inappropriate in this case by the fact that legal action is often taken pursuant to a single provision of a statute, and finding one provision of a statute unconstitutional does not, therefore, invalidate actions taken under another. By

contrast, as the majority explains, the Commission acts as a body. It is impossible to identify in, or more importantly, to exclude from prior actions of that body the influence of the two Article III judges who are members of the Commission.

I must also reject the majority's attempt to accord *de facto* legitimacy to the Commission's actions under the approach prescribed in *Buckley v. Valeo,* 424 U.S. 1, 142, 96 S.Ct. 612, 693, 46 L.Ed.2d 659 (1976). The *Buckley* approach, which was formulated in response to a violation of the Appointments Power, Article II, Section 2, cl. 2, is inapplicable here. In *Buckley,* the problem was not that any member of the Federal Election Commission was unfit, by reason of other governmental duties, to exercise his powers; the problem there was simply that the members of the Commission had been appointed by the Congress rather than the President. Because the reconstitution of the Federal Election Commission did not require an alteration in its membership, and cast no doubt on the continuing viability of the actions it had taken, the conferral of *de facto* validity was a plausible solution.[1] Here, where the reconstitution of the President's Commission in accordance with Separation of Powers principles requires an alteration in its membership, it would be improper for this Court to second guess the influence of the disqualified members of the Commission, by according *de facto* validity to its prior actions in connection with Scaduto.

Thus, I believe we have no choice but to hold all prior actions of the Commission in its attempt to secure Scaduto's testimony invalid and to reverse the judgment of the district court.

---

**1.** The *Buckley* Court may have been mistaken, however, in taking its remedial bearings from the reapportionment cases. *See id.* at 142, 96 S.Ct. at 693. These cases imposed *de facto* validity on the legislation enacted by legislatures elected from malapportioned districts, because to do otherwise would have "produce[d] chaos."

*Ryan v. Tinsley,* 316 F.2d 430, 432 (10th Cir. 1963). It is unclear that chaos would have resulted from the invalidation of the prior acts of the Federal Election Commission, and it surely will not result from the invalidation of the acts of the President's Commission on Organized Crime in connection with Scaduto.