UNITED STATES of America, Plaintiff,

v.

Bernard SMITH, Defendant.

No. 87–CR–374.

United States District Court,
D. Colorado.

March 25, 1988.

Catharine M. Goodwin, Asst. U.S. Atty., Denver, Colo., for plaintiff.

Charles Szekely, Asst. Federal Public Defender, Denver, Colo., for defendant.

MEMORANDUM OPINION
AND ORDER

KANE, District Judge.

## I BACKGROUND

On December 9, 1987 Bernard Smith was indicted for the offense of escape from custody in violation of 18 U.S.C. § 751. On January 15, 1988 he entered a plea of guilty to the offense. Presently, he awaits sentencing.

The offense was committed on November 29, 1987. Defendant therefore falls to be sentenced according to the terms of the Sentencing Reform Act, 1984, 28 U.S.C. §§ 991–98 (1987), since it applies to offenses committed after November 1, 1987.

Smith has moved to declare the Sentencing Reform Act of 1984 constitutionally invalid. Similar motions have been filed by defendants throughout the country. Three courts to date have fully addressed this issue. In *United States v. Ira Russell Arnold,* 678 F.Supp. 1463 (S.D.Cal.1988), the United States District Court for the Southern District of California declared the Act unconstitutional. An order adopting the reasoning of that case was issued in *United States v. Manley,* No. 87–1290–R, slip op. (S.D.Cal. Feb. 18, 1988). A similar order was issued in Texas in *United States v. James Alton McLean,* No. B–87–544, slip op. (S.D.Tex. March 2, 1988) [available on WESTLAW, 1988 WL 90378]. In *United States v. Ruiz–Villaneuva, Linares, Santee and Casarez,* 680 F.Supp. 1411 (S.D. Cal.1988) another judge of the Southern District of California ruled the Act constitutional. In *United States of America v. Michael Chambless et al.,* 680 F.Supp. 793 (E.D.La.1988), the Act was also declared constitutional. The reasoning of *Chambless* was adopted in *United States v. Antonio Jose Franco, et al.,* No. 87–44, (E.D.Ky. March 18, 1988). A written opinion is awaited in this case. In *Federal Defenders of San Diego v. U.S. Sentencing Commission,* 680 F.Supp. 26 (D.D.C.1988) a similar action was dismissed on the grounds plaintiffs lacked standing.

No standing issue arises in this case.

## II THE SENTENCING REFORM ACT

The Sentencing Reform Act of 1984 represented the culmination of over ten years of effort commenced in 1971 by the National Commission on Reform of Federal Crimi-

nal Laws.[1] The determination to overhall the traditional federal sentencing framework sprang from a deep-rooted dissatisfaction with a perceived lack of comprehensiveness and consistency in federal sentencing and the limited availability of sentencing options under the old system, see Sen. Rep. No. 98–225, 37–50 (98th Cong. 2nd Session, September 14, 1983), U.S.Code Cong. & Admin.News 1984, pp. 3182, 3220–3232.[2]

To this end, Congress established the new and not uncontroversial sentencing system at issue in this case.[3] The fulcrum of the Sentencing Reform Act is the United States Sentencing Commission, 28 U.S.C. § 991. It is styled 'an independent commission in the judicial branch of the United States', § 991(a).[4] Its seven voting members and one non-voting member are appointed by the President and are removable by him only for neglect of duty, malfeasance in office or 'for other good cause shown', *id.* Three of the voting members must be federal judges, *id.* These three members are selected from a group of six recommended to the President by the Judicial Conference of the United States, *id.* A federal judge may serve as a member of the commission without resigning from his position on the bench, 28 U.S.C. § 992(c). The voting members of the commission are appointed for terms of no more than six years, and no member may serve more than two full terms, 28 U.S.C. § 992(a) and (b). The commission acts by an affirmative vote of at least four voting members, 28 U.S.C. § 994(a). One of the seven voting members of the commission is appointed chairman by the President, § 991(a). The chairman of the commission is responsible for convening and presiding at commission meetings, § 993(a). He is further responsible for preparing requests for appropriations for the commission and for directing the use of commission funds, § 993(b). The commissioners serve full time for the first six years of the guidelines coming into effect. Thereafter, the voting members, with the exception of the chairman, serve part time as necessary to perform the duties and powers of the commission, § 992(c). There is no prohibition in the statute upon a federal judge being appoint-

1. National Commission on Reform of Federal Criminal Laws, Final Report (1971).

2. The respective roles of the judiciary and the executive branch under the old system are set out well in *United States v. Grayson,* 438 U.S. 41, 47, 98 S.Ct. 2610, 2614, 57 L.Ed.2d 582 (1978) and see also *Geraghty v. United States Parole Commission,* 719 F.2d 1199, 1211 (3rd Cir.1983) *cert. den.* 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 133 (1985). Congress in enacting the statute was motivated by a number of other concerns. It was felt the concepts of indeterminate sentencing and parole release were based on an 'outmoded rehabilitation model', S.Rep. No. 225, 98th Cong. 2nd Sess, 38, U.S. Code Cong. & Admin.News 1984, p. 3221. It was felt also the dividing of sentencing authority between the judge and the parole commission resulted in a widespread uncertainty about the length of time offenders would spend in prison, S.Rep. at 46, 49, U.S.Code Cong. & Admin.News 1984, pp. 3229, 3232.

3. The system is established by 28 U.S.C. § 991–998; 18 U.S.C. §§ 3553–3574; 3581–3586; 3611–3615; 3621–3625; 3742 and P.L. 98–473 § 235(a) as amended P.L. 100–182 and P.L. 100–185. The statute is one part of the multiple-titled Comprehensive Crime Control Act of 1984.

It has generated considerable attention, Note, *The United States Sentencing Commission: A Constitutional Delegation of Congressional Power,* 55 Ind.L.J. 117, 132–133 (1979), *Supreme Court Report: Gramm–Rudman Held Invalid.* A.B.A.J. Oct 1, 1986, 52., Liman *The Constitutional infirmities of the United States Sentencing Commission,* 96 Y.L.J. 1363 (1987), Killian, *The Sentencing Commission: Lost In The Interstices of Separation of Powers,* 34 Fed.B.News & J. 266 (July/Aug. 1987), Robinson, *A Sentencing System for the 21st Century,* 66 Tex.L.R. 1. (1987), Chief Judge Weinstein (E.D.N.Y.), *The Role of Attorneys Under New Sentencing Guidelines,* N.Y.L.J. (12/16/87). It has been described as 'the most dramatic change in our Nation's history ... in the Federal Criminal Justice System', 133 Cong.Rec. H8107 (Rep. Conyers, Oct. 5, 1987). Senator Kennedy, one of the Act's principal proponents termed it 'the first comprehensive federal sentencing law and the most far reaching reform contained in the 23 chapters of the massive anti-crime package.', Kennedy, *The Sentencing Reform Act of 1984,* 32 Fed.B.News & J. 62, 62 (Feb. 1985).

4. The commission remains adamant that it is judicial in nature. In the introduction to the guidelines of October, 1987 it describes itself as an 'independent commission in the judicial branch'.

ed chairman.[5]

The purposes of the commission are two fold. First, it is directed to establish sentencing policies and practices for the federal criminal justice system which assure the realization of the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2)[6], provide certainty and fairness in meeting those functions and reflect advances in the understanding of human behavior insofar as relevant to the criminal justice process, § 991(b)(1). Second, it is designed to develop means of measuring the extent to which sentencing practices are effective in meeting the stated purposes of sentencing. 28 U.S.C. §§ 994 and 995 then set forth respectively the duties and powers with which Congress has equipped the commission to facilitate an effective realization of these purposes.

§ 994(a) obliges the commission to establish guidelines for the use of a sentencing court in determining the sentence to be imposed in a criminal case. These guidelines must include a determination whether to impose a sentence of imprisonment, probation or a fine, a determination of the appropriate amount of a fine, and length of period of probation or term of imprisonment, a determination of whether sentence to a term of imprisonment should include a requirement of supervised release, and a determination whether multiple sentences to terms of imprisonment should run concurrently or consecutively, § 994(a)(1). § 994(b) then provides,

(1) The commission in the guidelines promulgated pursuant to subsection (a)(1), shall, for each category of offense involving each category of defendant, establish a sentencing range that is consistent with all pertinent provisions of title 18, United States Code.

(2) If a sentence specified by the guidelines includes a term of imprisonment, the maximum of the range established for such a term shall not exceed the minimum of that range by more than the greater of 25 per cent or 6 months, except that, if the minimum term of the range is 30 years or more, the maximum may be life imprisonment.

In establishing categories of offenses for use in the guidelines, the commission must consider the grade of the offense, the harm caused by the offense, the public concern generated by the offense, the deterrent effect a particular sentence will have on the offense, and the current incidence of the offense, § 994(c). In considering categories of defendants a further list of factors must be considered including age, education community ties and role in the offense, § 994(d).

The commission is then directed to draw up 'general policy statements regarding application of the guidelines or any other aspect of sentencing or sentence implementation' that will further the purposes outlined in 18 U.S.C. § 3553(a)(2), § 994(a)(2). These policy statements must negotiate the possible use of sanctions, conditions of probation and supervised release, sentence modifications, imposition of fines, plea agreement authorities and implementations, guidelines for the revocation of probation and temporary release provisions and pre-release custody.

In promulgating the guidelines, the commission is directed to take into account the nature and capacity of federal penal institutions and is obliged to make recommendations concerning any changes in those facilities necessitated by the guidelines, § 994(g). It must further consider factors such as the treatment to be allotted to first offenders, rehabilitation, incremental penalties, and substantial assistance rendered by a defendant in the investigation or prosecution of another person who committed an offense, § 994(j)–(m). The act also pro-

---

**5.** In fact the current chairman is Judge William W. Wilkins of the Fourth Circuit. The other judge-commissioners are Judge Stephen G. Breyer of the First Circuit and Senior Judge George E. Mackinnon of the D.C. Circuit.

**6.** 18 U.S.C. § 3553(a)(2) details four main purposes of sentencing. These are a reflection of the gravity of the offense at issue, the promotion of respect for the law and the provision of just punishment for the offense, the affording of adequate deterrence to criminal conduct, the protection of the public from further crimes of the defendant and the provision of the defendant with any necessary correctional treatment.

vides more specific guidance regarding certain categories of defendants including those with prior convictions or those who commit violent crimes, § 994(h), (i). The commission must make recommendations to Congress dealing with the maximum utilization of resources to deal effectively with the Federal Prison Population, § 994(q). It must make recommendations on an ongoing basis to Congress regarding the modification of the guidelines including the grades or maximum penalties of those offenses for which it sees fit, § 994(p), (r), (t), (u). The commission's duties also include conferring with specified organizations and the collecting and distributing of information. The commission has a duty to consider any petition filed by a defendant requesting modification of the guidelines as utilized in the sentencing of that defendant, § 994(s). Each judge must submit to the commission a report of every sentence handed down under the guidelines, § 994(w).

§ 995 then delineates the powers of the commission. These are largely of an administrative nature, but include the power to establish research and development programs § 995(a)(12), to issue to probation officers instructions concerning the application of the guidelines and policy statements § 995(a)(10), to publish data and to collect and disseminate information, § 995(a)(14), (15). This section provides that a simple majority of the membership of the commission shall constitute a quorum for the conduct of business, § 995(d).

The guidelines currently controlling were promulgated by the Commission on April 13, 1987, as amended on December 15, 1987 and January 5, 1988. Their character was well described by the court in *Ruiz–Villanueva*,

Offenses were grouped into 43 base levels, according to relative severity. Recommended sentences for each base level were figured, after a review of past sentencing practices. Consideration of certain aggravating and mitigating circumstances was allowed in order to take into account the gravity of a specific crime. The Commission also categorized offenders into six groups on the basis of their criminal history. The Commission then plotted the coordinates for offenses and offenders and produced a grid which sets out sentencing ranges. The Commission estimated that the guidelines as originally promulgated would apply to ninety percent of all cases in the federal courts (with amendments forthcoming as necessary).

at p. 1415.

The guidelines, actually mandates, are then imposed upon the federal courts by 18 U.S.C. § 3553(b),

The court shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4)[7] unless the court finds that an aggravating or mitigating circumstance exists that was not adequately taken into consideration by the Sentencing Commission in formulating the guidelines and that should result in a sentence different from that described.

Indeed, as the government has itself noted, this binding quality of the 'guidelines' means they are not guidelines at all.[8] Either the government or the defendant may appeal should a sentence be imposed outside the commission guidelines, 18 U.S.C. § 3742. The statute further abolishes the Parole Commission, with effect from five years after the guidelines come into opera-

---

7. Subsection (a)(4) obliges a judge in imposing a sentence to consider the sentencing range established for the particular category of offense as set forth in the guidelines promulgated pursuant to 28 U.S.C. § 994(a)(1). Subsection (a)(5) obliges a judge also to consider applicable policy statements issued by the commission.

8. For an example of the extent to which the Supreme Court perceived the sentencing guidelines in operation in the State of Florida an emasculation of judicial discretion, see *Miller v. Florida*, — U.S. —, 107 S.Ct. 2446, 2453, 96

L.Ed.2d 351 (1987). This is not uninteresting in the present context, for a court in Florida could depart from the guidelines there upon a showing of 'clear and convincing reasons'. This is a far lower standard than applicable under the federal guidelines which require a finding of an 'aggravating or mitigating circumstance' 'that was not adequately taken into consideration by the Sentencing Commission in formulating the guidelines and that should result in a sentence different from that described', 18 U.S.C. § 3553(b).

tion, Pub.L. 98–473, Title II § 235. Accordingly, it is clear the actual time served by an offender under the new system is likely to be substantially longer than it was before. It is equally clear that a new and larger bureaucracy has been substituted for an older and less pervasive one.

 Defendant submits two broad arguments in favor of his contention that the scheme enacted by the statute is unconstitutional. First, he asserts the membership of judges on the commission violates the principle of separation of powers. He also contends in this context that the removal power vested in the President violates due process and separation of powers. His second argument is that the authority given to the commission by Congress to write and promulgate the official guidelines represents an unconstitutional delegation of authority. I shall deal with these contentions in the following fashion. First, I shall examine the question of separation of powers from the standpoint of the problem of membership of judges on the commission. Second, I shall consider the delegation of authority contention. Finally, I shall make some general observations regarding the operation of the Act which have not been specifically raised by counsel in this case.[9]

## III SEPARATION OF POWERS

### 1. The Doctrine.

The tripartite framework for power erected by the Constitution around the legislature, the executive and the judiciary provided 'the foundation of a structure of government that would protect liberty', *Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 3186, 92 L.Ed.2d 583 (1986). As the Supreme Court pointed out in *Myers v. United States*, 272 U.S. 52, 116, 47 S.Ct. 21, 25, 71 L.Ed. 160 (1926), the framers sought to embrace 'Montesquieu's view that the maintenance of independence as between the legislative, the executive and the judicial branches' was an essential prerequisite to the resistance of tyranny. The rationale behind such concerns is not difficult to comprehend. As James Madison asserted,

> where the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department, the fundamental principles of a free Constitution are subverted.

*The Federalist*, No. 47, pp. 302–303 (C. Rossiter ed. 1961) (Emphasis in original)

The core function of the doctrine is accordingly to ensure resistance to '[t]he hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power', *INS v. Chadha*, 462 U.S. 919, 951, 103 S.Ct. 2764, 2784, 77 L.Ed.2d 317 (1983).

Nonetheless, the doctrine does not operate in a political vacuum. As Chief Justice Taft noted in *Hampton v. United States*,

---

**9.** I note that already the question of the constitutionality of the Act has provoked a complex matrix of approaches. The Assistant U.S. Attorney on the case contends the function exercised by the commission is executive in nature, but that the assignment of the commission to the judicial branch, while improper, is severable. She argues from there, however, that the commission's exercise of an executive power does not raise separation of powers problems. The Sentencing Commission itself, however, in an *amicus* brief lodged with the court refuses to concede that the power exercised by the commission is executive, contending instead that the functions allotted to the commission by the Act are properly and constitutionally characterized as judicial. Hence, it argues no separation of powers problems arise. In *Arnold* the court held the commission performed executive functions and that accordingly its designation in the judicial branch was itself unconstitutional. In *Ruiz–Villanueva* the court held the functions of

the commission were judicial, and that accordingly the separation of powers did not pose a significant problem. In *Chambless*, the court found no constitutional impediment to the judges on the commission performing non-judicial functions. It viewed the commission as an independent agency performing executive functions.

As a matter of law, I denied the Sentencing Commission's motion for permission to file the *amicus* brief referred to above or to make oral argument. A clear precondition of appearing as an *amicus curiae* or for such a brief being filed is that the movant not be a party to the dispute in issue. Here, the United States is a party to this dispute and the commission is by definition an arm of the United States. Nonetheless, the parties gave full attention to the points raised by the commission and I have read carefully its brief in an attempt to give full consideration to the issues raised therein because I regard them to be of considerable general importance.

276 U.S. 394, 406, 48 S.Ct. 348, 351, 72 L.Ed. 624 (1928)

> This is not to say that the three branches are not co-ordinate parts of one government and that each in the field of its duties may not invoke the action of the two other branches in so far as the action invoked shall not be an assumption of the constitutional field of action of another branch.

This appreciation of the exigencies of efficiency has prompted a view of the doctrine of separation of powers as imposing upon the branches of government 'separateness but interdependence, autonomy but reciprocity', *Youngstown Sheet and Tube Co. v. Sawyer*, 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (Justice Jackson concurring). As the Supreme Court said of the framers in the context of the doctrine,

> They likewise saw that a hermetic sealing off of the three branches of Government from one another would preclude establishment of a Nation capable of governing itself effectively.
> *Buckley v. Valeo*, 424 U.S. 1, 121, 96 S.Ct. 612, 683, 46 L.Ed. 659 (1976).

■ This in turn has encouraged the court to appreciate the limited utility of a perception of the concept of separation of powers which is purely normative. Instead, the emphasis in subjecting government to scrutiny under the doctrine is functional. The proper inquiry is upon the extent to which the encroachment of one branch of government upon another prevents the affected branch from accomplishing its constitutionally assigned functions, *Nixon v. Administrator of General Services*, 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977) citing *United States v. Nixon*, 418 U.S. 683, 711–712, 94 S.Ct. 3090, 3109–3110, 41 L.Ed.2d 1039 (1974). As the court pointed out in *Nixon v. Administrator of General Services*,

> Only where there is potential for disruption present must we then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress.

433 U.S. 425, 97 S.Ct. 2777.

It must be said that the approach adopted by the Supreme Court in recent years to separation of powers problems could lead one to question the continued vitality of this functional approach in the form enunciated in *Nixon*, see particularly *Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986). For reasons I shall mention at greater length below, the 'functional approach' rests upon a somewhat incomplete historical account of the doctrine, at least when matched against the problems arising from the participation of members of one branch of government in affairs more properly regarded as the concern of another. Nonetheless, I will abide by the *Nixon* test here, if only to err on the side of caution.

This approach has its difficulties. It infuses the doctrine of separation of powers with an amorphous, but nonetheless essential, component that renders judicial consideration of the principle always difficult and reliance upon precedent frequently unhelpful. The analysis mandated by this functional aspect of the separation of powers has been described variously as 'a delicate exercise in constitutional interpretation' *Baker v. Carr*, 369 U.S. 186, 211, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962), 'a pragmatic analysis of the extent to which an act by one branch of government prevents another from performing its assigned duties', *Geraghty v. United States Parole Commission*, 719 F.2d 1199, 1211 (3rd Cir.1983), and 'a formidable task', *United States v. Brainer*, 515 F.Supp. 627, 630 (D.Maryland, 1981).

### 2. The Doctrine and the Judicial Branch.

In the context of asserted intrusions into the sphere of the judiciary, these difficulties are of an even more imposing nature. While the duties, powers and functions of the legislature and the executive might in general be readily listed and easily identified, those of the judiciary necessarily import a more elusive component. Partiality and predetermined views on behalf of their members are an accepted and integral ele-

ment of the legislative and executive processes. In the case of the judiciary, however, impartiality and absence of predetermined opinions are fundamental aspects of the judicial function. As the Supreme Court has stated,

> The Federal Judiciary was ... designed by the Framers to stand independent of the Executive and Legislature—to maintain the checks and balances of the constitutional structure, and also to guarantee that the process of adjudication itself remained impartial.

*Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 58, 102 S.Ct. 2858, 2864, 73 L.Ed.2d 598 (1982).

When we are dealing, as here, with the conduct of individuals holding offices within the three branches of government, severance of the individual from the position he held may be possible in some circumstances with a member of the legislative or the executive. With a member of the judiciary, however, the distinction is conceptually facile. As the court pointed out regarding the application of the doctrine of separation of powers to the judicial branch in *In re Sealed Cases*, 838 F.2d 476 (D.C.Cir.1988),

> It also preserves an independent and neutral judiciary, relatively removed from the decisions and activities of the other two branches. Discharging tasks other than the deciding of cases and controversies would 'involve the judges too intimately in the process of policy and thereby weaken confidence in the disinterestedness of their judicatory functions'.

at p. 512, quoting F. Frankfurter, Advisory Opinions, 1 *Encyclopedia of the Social Sciences* 475, 478 (1930).

The preservation of judicial detachment has posed a constant and difficult historical problem. A perusal of the, admittedly few, decisions dealing with the impact of the separation of powers on the functions of the judiciary both defines its magnitude and indicates the great care which should

be taken in examining claimed violations of the principle in context.

In *Hayburn's Case*, 2 U.S. (2 Dal.) 408, 1 L.Ed. 436 (1792) the Supreme Court encountered the question of the validity of a statute which purported to vest in the Court of Appeals the power to settle pension claims of widows, invalids and orphans. These determinations were then subject to revision by Congress and the Secretary of War. While the issue was determined moot, the court included in its opinion the decisions of three courts which cast doubts over the validity of the Act. These decisions found the legislative control facilitated by the Act 'radically inconsistent with the independence of [the] judicial power'. More on point, the objection was raised that 'neither the Legislative nor the Executive branches can constitutionally assign to the judicial any duties but such as are properly judicial, and to be performed in a judicial manner'. The duties assigned to the courts by the Act were not of a judicial character.[10]

The court considered the latter problem further in *United States v. Ferreira*, 54 U.S. (13 How.) 40, 14 L.Ed. 40 (1851). Here it was faced with an appeal under a statute directing a United States District Court in Florida to receive and adjust injury claims arising from the Treaty of 1819 with Spain. The court found that processing of claims in this fashion was not a judicial act. Therefore, the power could not be imposed upon the district court *qua* the district court. It elected to construe, however, the statute as conferring the power in question upon the district judge in question in his capacity as a commissioner. In so determining, the court made clear that extrajudicial duties may be imposed upon Article III judges on an individual basis that could not be imposed upon a court acting as such.

*Ex Parte Siebold*, 100 U.S. (10 Otto.) 371, 25 L.Ed. 717 (1879) concerned the validity of a statute vesting the courts with the power to appoint election commissioners. In upholding the Act, the court examined

---

**10.** See also *United States v. Yale Todd*, 54 U.S. (13 How.) 51, 14 L.Ed. 47 (1794), discussed in *Ferreira*.

the propriety of imposing upon the judiciary duties of appointment which were admittedly non-judicial. In deciding to uphold the constitutionality of the Act, the court emphasized 'the duty to appoint inferior officers, when required thereto by law, is a constitutional duty of the courts' and further that 'in the present case there is no ... incongruity in the duty required so as to excuse the courts from its performance', 100 U.S. at 398.

In *Hobson v. Hansen*, 265 F.Supp. 902 (D.D.C.1967) a three judge district court for the District of Columbia considered the validity of a D.C. statute requiring that members of the board of education be appointed by the United States district judges for the district. While the validity of the provisions was upheld on two grounds not immediately relevant here, the court also considered the power of the federal judiciary to perform non-judicial functions. In upholding the statute in question on this ground also, the court asserted '[t]here is no constitutional principle that federal judges may not engage officially in non-judicial duties', 265 F.Supp. at p. 915. Here, it should be noted, relying upon the holding in *Siebold* the court distinguished between powers of appointment and those of an ongoing administrative nature.

In *Re Sealed Cases*, the United States Court of Appeals for the District of Columbia considered the constitutionality of the Ethics in Government Act of 1978, 28 U.S.C. §§ 49, 591–598 (1982 & Supp.III). The grounds of challenge were the independent counsel appointed under the Act to investigate the actions taken by appellants while serving in government positions was appointed by a Special Court (the Independent Counsel Division of the United States Court of Appeals for the District of Columbia Circuit[11]) upon motion of the Attorney General, and that counsel's prosecutorial jurisdiction was to be defined by the court. This, it was argued, constituted a violation of the separation of powers. The court agreed.

Examining the holding in *Hobson v. Hansen*, it characterized the court there as concerned with appointment of an officer and not with the type of ongoing supervision with which the Ethics in Government Act was concerned. It agreed a violation of the separation of powers principle had occurred, finding the intimate involvement of an Article III court in the supervision and control of a prosecutorial office undermined the status of the judiciary as a neutral forum for the resolution of disputes between citizens and their government. Interestingly, however, it also found that independent of this functional impact on the judiciary occasioned by the violation of the principle of separation of powers, the doctrine was implicated by the very fact the Article III court was being called upon to 'administer the executive office', at p. 512. It also emphasized that the case and controversy limitation of Article III was intimately bound up with the separation of powers doctrine.

Two decisions bearing more directly upon the problem at issue in this case, are *In Re Application of the President's Commission on Organized Crime, subpoena of Lorenzo Scaduto*, 763 F.2d 1191 (11th Cir. 1985) and *In the Matter of the President's Commission on Organized Crime, subpoena of Nicodemo Scarfo*, 783 F.2d 370 (3rd Cir.1986). Both involved challenges to the constitutionality of the President's Commission on Organized Crime. In both, witnesses subpoenaed to appear before the commission argued the presence of two Article III judges on the commission violated the principle of separation of powers.

In *Scaduto* the Eleventh Circuit commenced its analysis with the observation that 'conferring non-judicial functions on members of the judiciary may raise separation of powers problems', 763 F.2d at 1196. It then distilled from the *Nixon* cases the following inquiry,

does the imposition of powers traditionally associated with one branch of government on officials of another branch inter-

---

**11.** The Special Court was composed of three judges designated by the Chief Justice of the United States. One member of the Court had to be a member of the United States Court of Appeals for the District of Columbia Circuit, 28 U.S.C. § 49.

fere with their ability to perform their constitutionally required duties in the branch of which they are a part? 763 F.2d at 1196–1197.

In determining that in the case of the Article III judges on the commission it did, the court identified the following core duty of the judiciary,

> Impartiality is one of the central, constitutionally-ordained requirements of the federal judicial office.

763 F.2d at 1197, citing *United States v. Will,* 449 U.S. 200, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980).

In concluding that the membership of judges on the commission interfered with this aspect of the judicial function, the court focussed on the impact upon the individual judges of their duties as commissioners. It pointed out the difficulties they would encounter in separating their experiences on the commission from the situations they might encounter on the bench. It further reasoned that even if this should not pose a problem to the individual judges it was not clear that litigants could sustain equal faith in their impartiality, 763 F.2d at 1197. Accordingly, the court reasoned, the conferral of this power on judges violated the principle of the separation of powers.

In *Scarfo,* the Third Circuit began its analysis from a not dissimilar perspective. Two important points observed by the court, however, prompted it to the opposite conclusion. First, it noted that in the case of the President's Commission on Organized Crime, the participation of the Article III judge's was voluntary. It asserted,

> we think it more accurate to focus on the voluntary acceptance of that authority by judicial officers. The attention should be on the judge's conduct and not that of

those who tendered, but did not impose, the powers.

783 F.2d at 378.[12]

The second point related to the limited nature of the disruption caused to the federal judicial system as a whole by the participation of judges on the commission. Members of the commission, it asserted, who found themselves open to accusations of bias while on the bench could simply recuse themselves. In this regard the court system would be faced with 'a limited dislocation and not one which would require reassignment of a large number of cases', 783 F.2d at 381.

■ As I shall discuss below, it is unnecessary for me to choose between these two cases. Nonetheless, I accept the force of the latter argument. Defendant here contends the judge-members of the United States Sentencing Commission would have to recuse themselves from a considerable number of cases in order to avoid either bias or the appearance of it thereby furnishing the disruption to the judicial system required by the *Nixon* test. In my view this degree of disruption does not suffice to justify negating the Act on separation of powers grounds.[13] A more broadly based dislocation of the judicial system and violation of the tripartite powers doctrine is needed to support such a contention.

All of these cases have involved the complex and close relationship between the separation of powers doctrine and the principle that functions of an administrative nature may not be imposed upon Article III judges. Every judge is painfully aware of the close distinctions, fine lines and complex constitutional history which have characterized this problem.[14] On the one side are *Hayburn's Case* and *United States v.*

---

**12.** The exact connotation of this assertion has caused problems in the instant case. Defendant argues that the presence of judges on the Sentencing Commission is not voluntary because the statute mandates such. It is clear from the context, however, that the relevant focus is upon the question of whether the individual judges are given a choice whether or not to sit on the commission. Here, of course, they are. Hence, this is not a basis for distinguishing *Scaduto.*

**13.** In this regard my conclusion squares with that of the court in *United States v. Arnold,* at p. 1469.

**14.** Most of the examples in the following two paragraphs are adopted from McKay, *The Judiciary and Nonjudicial Activities,* 35 Law and Contemporary Problems 9, (1970). Appropriate citation references may be obtained therein. See also *Scarfo,* 783 F.2d at 379.

*Ferreira.* Here as well one finds the assertion of the Jay Court in 1793 in response to an inquiry by President Jefferson as to whether the judiciary could make itself available to advise the executive on legal questions that 'the lines of separation between the three departments of government' prohibited the giving of such advice.

In 1942, Chief Justice Stone declined President Roosevelt's request to serve on a commission investigating the rubber shortage. In undertaking such assignments, he asserted, a judge invited attack and pointed to his 'peculiar situation' and the 'appropriate influence of his office'. He raised similar objections when asked to serve on the United States Ballot Commission. When asked to serve on the Commission to Investigate the assassination of President Kennedy, Chief Justice Warren initially declined asserting 'it is not in the spirit of constitutional separation of powers to have a member of the Supreme Court serve on a presidential commission'. Indeed, it would seem Chief Justice Burger raised this very objection with the President when the idea of three judges sitting on the U.S. Sentencing Commission was first proposed.[15]

On the other side are the decisions in *Siebold* and *Hobson v. Hansen.* John Jay served as Ambassador to England while Chief Justice in 1794. John Marshall was both Secretary of State and Chief Justice for a short period of time. Justice William Johnson was an advisor to President Monroe on federal-state relations. Chief Justice Taft was heavily involved in congressional politics[16] and engaged in a number of diplomatic missions. Justice Jackson served as a prosecutor at the Nuremburg trials while a sitting Supreme Court Justice. Judge Higginbotham served on the National Commission on the Causes and Prevention of Violence and a number of judges sit on the National Commission on Reform of Federal Criminal Laws. The Chief Justice similarly has a number of statutorily assigned non-adjudicative tasks, including administrative responsibilities for the Supreme Court and the federal judiciary.[17]

It is clear that the practice of appointing federal judges to non-judicial positions does not evidence an 'unbroken history' as the government has sought to argue. Strong reservations have been asserted by many judges to this practice. Hence decisions seeking to allot constitutional force to this practice are unhelpful, see *Marsh v. Chambers*, 463 U.S. 783, 790, 103 S.Ct. 3330, 3335, 77 L.Ed.2d 1019 (1983).

Nonetheless, a number of distinctions need to be made. First, there is a difference between allotting non-judicial functions to the courts and to individual judges. Second, there is a clear distinction between facilitating voluntary participation by judges in extra-judicial activities and forcing them to do so. Third, it is undoubtedly permissible to enable courts to execute managerial functions designed to facilitate the judicial process. These distinctions have been much preyed upon by the government in this case. While they clearly play a role in the resolution of the instant problem, their application to the system and method adopted by Congress in embroiling the judiciary in the Sentencing Commission is questionable in the extreme.

■ Wherever the line is drawn, however, what emerges from a consideration of this history is that an exceedingly broad system of interests is implicated when separation of powers issues arise involving members of the judiciary in their individual capacities. The cases and examples discussed above are important here for two reasons. First, they clearly dictate that in examining the functional impact of a *prima facie* violation of the separation of powers principle involving the judiciary, particular care must be taken to ensure the quintessential quality of impartiality is not violated. The point was made most forcefully in *In Re Sealed Cases* when the court observed that the involvement of Article

---

**15.** See Liman. 96 Y.L.J. p. 3164 n. 11.

**16.** To such an extent that his activities off the bench have been described as 'possibily the

most extensive in the history of the [Supreme] Court.', McKay *supra* at p. 33.

**17.** And see 2 U.S.C. § 352(1)(D).

III courts in the supervision and control of a prosecutorial office 'undermines the status of the judiciary as a neutral forum for the resolution of disputes between citizens and their government' at p. 516. The second point to emerge is the complete impossibility of severing the fundamental principle that 'executive or administrative duties of a nonjudicial nature may not be imposed on judges holding office under Article III of the Constitution', *Buckley v. Valeo,* 424 U.S. at p. 123, 96 S.Ct. at 684, from the separation of powers doctrine. This is important, for the courts in both *Scaduto* and *Scarfo* labor at points under the impression that the doctrines are distinct. Even a brief perusal of *Hayburn's Case* indicates this is not true. Thus, while in *Ferreira* the court saw no objection to allowing the power to adjudicate claims to be allotted to the judges personally as commissioners, in opposition to imposing such a duty on courts, it is impermissibly deduced that Congress may ask judges to perform whatever non-judicial functions it pleases. The holding in *Ferreira* must be viewed against the background of separation of powers principles. This means that Congress may only impose non-judicial functions on individual judges if doing so does not in the individual case violate the dictates of that doctrine. Similarly, the holding in *Hobson v. Hansen* must be viewed within this context.

It is axiomatic that Article III courts may not generally be allotted non-judicial functions by other arms of government. This principle is in itself an extrapolation of the separation of powers doctrine. Therefore, the question arises whether the functional approach of the Court in *Nixon* has any role at all to play in issues of this nature. While not perhaps a persuasive interpretation of *Nixon* in the context of the legislative and executive branches, Justice Powell's following observation is pertinent as regards the judicial branch and the separation of powers;

> [It] may be violated in two ways. One branch may interfere impermissibly with the other's performance of its constitu-

tionally assigned function. Alternatively, the doctrine may be violated when one branch assumes a function that more properly is entrusted to another.

*INS v. Chada,* 462 U.S. 919, 963, 103 S.Ct. 2764, 2790, 77 L.Ed.2d 317 (1983) (Powell J., concurring) (citations omitted).

The fact that mere participation by a judge in non-judicial activities may implicate separation of powers questions in my view leaves open to considerable doubt the question of whether the functional test of *Nixon* is of complete application to the judicial branch. A Kantian method of analysis seems preferable. While I do not need to decide the matter here, I reemphasize that in *In Re Sealed Cases* the court did not appear to apply singularly the functional test, preferring instead to assert,

> Of the three branches, it is the role of the judiciary that the Constitution most clearly and tightly confines within narrow borders.

At p. 516.

### 3. The United States Sentencing Commission—The Nature of the Power.

Here, I will examine two closely related issues. I shall discuss first the abstract question of the place of sentencing within the three branches of government. This has in itself given rise to a number of difficulties. From there, I consider the actual place the Sentencing Commission has been assigned within the limbs of government.

#### A. The Power to Sentence.

Here, the edges of the separation of powers doctrine and the delegation principle become blurred. My concern at this point is not with the issue of whether Congress has in fact properly delegated a quantum of the sentencing function to the Sentencing Commission, but with the threshold issues of whether that power may be delegated at all and then whether there are limits upon Congress' choice of means or agency within the three arms of government for that delegation.[18]

---

**18.** Defendant here has addressed only the ques- tion of whether delegation has properly oc-

This requires an analysis of three problems. First, to which branch of government does the power to prescribe a sentence for a crime belong? Second, may the branch to which that power belongs delegate any aspect of the power? Third, if the answer to this inquiry is yes, to which of the other two branches may that power be delegated?

■ First, the contention that the general prescription of punishment for a criminal offense is in some way an inherently judicial function must be scotched. It is not. The Supreme Court has stated,

> within our federal constitutional framework the legislative power, including the power to define criminal offenses and to prescribe the punishments to be imposed upon those found guilty of them, resides wholly with the Congress.
>
> *Whalen v. United States*, 445 U.S. 684, 689, 100 S.Ct. 1432, 1436, 63 L.Ed.2d 715 (1980).

In *United States v. Evans*, 333 U.S. 483, 68 S.Ct. 634, 92 L.Ed. 823 (1948), the court stated 'defining crimes and fixing penalties are legislative, not judicial functions'. '[L]egislatures remain free to decide how much discretion in sentencing should be reposed in the judge or jury in non-capital cases', *Lockett v. Ohio*, 438 U.S. 586, 603, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978). '[T]he authority to define and fix the punishment for a crime is legislative', *Ex Parte United States*, 242 U.S. 27, 42, 37 S.Ct. 72, 61 L.Ed. 129 (1916). In *United States v. Van Horn*, 798 F.2d 1166, 1168 (8th Cir. 1986) the Eighth Circuit opined that the legislature 'could if it wished, establish a mandatory set sentence for a particular crime, and it would be constitutional'. This has remained a constant theme of constitutional jurisprudence. In fact, during the first days of the Republic the period of incarceration was prescribed with specifici-

ty by the legislature.[19] Accordingly, the power to prescribe general sentences for particular offenses is a legislative one. As I shall mention later, this is not to say the power to prescribe a sentence for a particular defendant is legislative. It is not.

Given that the power to prescribe a sentence for a crime properly belongs to Congress, the next issue is whether that power can be delegated to another branch of government. The argument has surfaced from time to time within our constitutional jurisprudence that certain types of core functions exist within the legislative power that cannot be delegated, see *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43, 6 L.Ed. 253 (1825), *Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 406, 48 S.Ct. 348, 351, 72 L.Ed. 624 (1928). There is scant authority for this proposition, which appears to run counter to the basic principle that the grant of a constitutional power implies a facility to delegate authority in order to effect the underlying purposes of that power, *Lichter v. United States*, 334 U.S. 742, 778–779, 68 S.Ct. 1294, 1313–1314, 92 L.Ed. 1694 (1948). The argument was flatly and persuasively refuted in *Synar v. United States*, 626 F.Supp. 1374, 1385 (D.D.C.1986), *aff'd sub nom. Bowsher v. Synar*, 475 U.S. 1009, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986),

> First, plaintiffs cite no case in which the Supreme Court has held any legislative power ... to be non-delegable due to its 'core functions' status.... Second, adoption of a 'core functions' analysis would be effectively standardless. No constitutional provision distinguishes between 'core' and 'non-core' legislative functions, so that the line would necessarily have to be drawn on the basis of the court's own perceptions of the relative importance of various legislative functions.[20]

---

curred in fact under the heading of delegation of powers. I adopt this classification, but see *Ruiz–Villanueva*, at p. 1416.

**19.** Thus, defendant's claim that '[b]ecause traditionally Congress has set only a maximum sentence and occassionally has fixed a minimum sentence and left the rest to the judges, the Congress has converted a traditionally adjudica-

tory function into a legislative one by mandating that it be carried out by rule-making' (defendant's brief p. 9), is misplaced. But see section V *infra*.

**20.** Even if the 'core functions' analysis carried with it some weight, it is difficult to see how sentencing, which has always been distributed between the three limbs of government, could

See also *FPC v. New England Power Co.*, 415 U.S. 345, 352–353, 94 S.Ct. 1151, 1155–1156, 39 L.Ed.2d 383 (1974) (Justice Marshall concurring in part and dissenting in part). Given that the power to prescribe a sentence may be delegated by the legislature, the next question is whether it must be delegated to one of the executive or judicial branches.

■ As I shall discuss shortly, the nature of the functions implicated in the formulation of guidelines for the use of courts in sentencing is such that they naturally fall within the parameters of the executive. This is not to say Congress could not have delegated to the judiciary the power to determine sentences in individual cases arising before them. Rather it demands that if Congress should decide to delegate this power to the judiciary, it cannot demand the function be exercised in a fashion more appropriate to the executive branch. Nonetheless, defendant maintains there is a problem. He claims this submits the process to the risk of improper interference by the executive in a judicial function. As his argument runs, the coalition between the prosecutor and sentencer within the executive necessitated by the new guidelines renders in and of itself the act unconstitutional.

A consideration of *United States v. Gordon*, 580 F.2d 827 (5th Cir.1978) illustrates the infirmity of this argument. Here the court was faced with a challenge to the constitutionality of the Drug Abuse Prevention and Control Act of 1970 which gave the Attorney General the power to schedule, reschedule and deschedule drugs. In dealing with the contention that that Act unconstitutionally vested power to declare acts criminal with the prosecutor, the court emphasized that the Act then before it 'contains sufficient safeguards against arbitrary and unfair action', 580 F.2d at 840.

■ As I shall discuss further below in the context of the delegation doctrine, the Act presently under examination is specific enough in its detailing of the parameters of

executive discretion to ensure no impropriety in the grant of this general authority to the executive. Accordingly, and because there is no *per se* bar preventing the executive from effecting functions of this nature, this ground of challenge must fail. See *Geraghty v. United States Parole Commission*, 719 F.2d 1199 (3rd Cir.1983). Those authorities cited by defendant in support of this contention, *United States v. Wolfson*, 634 F.2d 1217, (9th Cir.1980), *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) are concerned with individual instances of violation of due process in particular cases which are in reality of little application to the instant situation, involving as it does a general delegation of legislative power.

This is not to say the executive has a *carte blanche* to act as it pleases in formulating these guidelines. Nor is it to say there are no limits imposed upon the nature of the guidelines that may be devised. What it means is that any such limitations that do exist spring not from any bar against delegation. I shall discuss the limitations upon its power and the implications those limitations impose on the commission in the final part of my opinion. Finally, these and other cases cited, *United States v. Marzano*, 149 F.2d 923, 926 (2d Cir.1945) assume that the promulgation of sentencing ranges is a judicial function which, as I have shown, it need not necessarily be.

### B. The Commission.

As I have pointed out, the commission is styled in the judicial branch of the United States, 28 U.S.C. § 991. This poses an initial problem. The government contends the court should effectively disregard this label and examine instead the nature of the functions exercised by the commission in order to determine which branch of government it actually operates within. This approach is grounded in the belief that if the commission is properly within the judicial branch, its composition is unconstitutional. Such an examination, the government as-

be one. Here I voice agreement with the reasoning of the court in *Ruiz–Villaneuva* at pp. 1416–1417.

serts, leads to the conclusion the commission is properly regarded as being within the executive.

The commission itself contends the label is correct and the placement of it within the judiciary in fact raises no constitutional difficulties. Defendant contends that either way the Act is unconstitutional. In *Arnold* the naked fact of placement within the judiciary was found to render the Act unconstitutional, p. 1470.

█ Although much argument has been made regarding this label, I am not going to dwell on the issue at length. The designation afforded by Congress should be disregarded. I have two reasons. First, as I shall discuss again in the context of the *Ruiz–Villaneuva* decision, the proper inquiry is to the substance of the commission's functions and not with the appellation Congress has chosen to attach.[21] This was the approach endorsed by the Supreme Court to problems of this nature in *INS v. Chada*, 462 U.S. at 952, 103 S.Ct. at 2784. Second, even if I am wrong in this regard— and I don't think I am—I find the allotment to the judiciary of this type of power is unconstitutional. However, my own impression is that insofar as this labelling is irregular, it is severable and accordingly poses no actual difficulty, see *Alaska Airlines v. Brock*, 480 U.S. 678, 107 S.Ct. 1476, 1480–81, 94 L.Ed.2d 661 (1987).

█ Nonetheless, I should briefly explain why I find placement in the judiciary of the United States Sentencing Commission would be improper. The functions exercised by the commission are executive in nature. Here, the commission exercises little that resembles a judicial power. Accordingly, placement within the judicial branch is a clear violation of the Article III case and controversy requirement, see *infra* this section, part 2. This is not a

situation involving the mere assignment of non-judicial functions to individual judges, it is an instance of these functions being assigned to the judiciary as a whole in clear violation of the principles enunciated in *Hayburn's Case*. Second, the removal power invested by the statute in the President is clearly in violation of the principle that members of one branch of government are not removable by members of another, *Bowsher v. Synar*, 106 S.Ct. at 3187–89. Third, the fact non-Article III judges are members of the commission violates the rule that non-Article III personnel may not usurp the functions of Article III judges, *Northern Pipeline v. Marathon Pipe Line*, 458 U.S. 50, 58–59, 102 S.Ct. 2858, 2864–2865, 73 L.Ed.2d 598 (1982). And see *Booth v. United States*, 291 U.S. 339, 350, 54 S.Ct. 379, 381, 78 L.Ed.2d 836 (1934) ('judicial acts would be illegal unless he who performed them held the office of judge').

Against this the commission raises three broad contentions. First, it asserts the issuance of the guidelines is in direct aid of the judicial function. I deal with this argument towards the end of this part of this section. Second, it claims the task of issuing the guidelines is not an exclusively executive function. I have dealt with this at the end of the previous part of this section. Finally, it claims there is no constitutional restriction upon non-judges serving on the judicial branch. This simply put conflicts with the clear mandate of the court in *Bowsher*. In short, the commission here wants to have its cake and eat it. It wants to claim it is a judicial body including as members non-judges exercising non-judicial powers which those members who are judges may legitimately perform. To this contention, I simply cannot accede.

Beyond argument, the functions of the commission are executive in nature.[22] The

---

**21.** This is all the more so where Congress itself seems to have labored under an inaccurate perception of the historical distribution of power within government. For example, it was stated, '[t]he better view is that sentencing should remain within the province of the judiciary', Sen Rep. at 54 and to the same effect at 159. Yet, as I have indicated, this is not a correct characterization of the pre-Act placement of the sentenc-

ing function, see also *United States v. Grayson*, 438 U.S. 41, 47, 98 S.Ct. 2610, 2614, 57 L.Ed.2d 582 (1978). Moreover, calling a horse a dog does not make it one.

**22.** For this reason it is unnecessary for me to consider the argument raised that the commission is an independent regulatory agency along

commission is presented with a statutory mandate to formulate guidelines for use by courts when sentencing, 28 U.S.C. § 994(a). It is presented with close parameters within which it must operate in formulating those guidelines. These range from the considerations to be accounted when establishing categories of offenses, § 994(c), to those to be taken into account in formulating categories of offenses, § 994(d). It is then directed, as extensively outlined above, to consider a plethora of factors in prescribing punishment within each offense and defendant category, § 994(e)–(m). All this involves the commission in the task of interpreting and applying the statute.

As such the role of the commission is little different from that performed by the Comptroller General under the 'Gramm–Rudman–Hollings Act' stricken by the Supreme Court in *Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986). As the Court observed in *Bowsher* '[i]nterpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law'. The parole commission for example, which executes similar functions, is part of the executive, 18 U.S.C. § 4202.

As in *Re Sealed Cases,* the primary function of the commission is the interpreting and application of congressional directive, and accordingly is clearly executive in nature, Slip Op. at p. 50. This classification is further clear from a consideration of those cases upholding the constitutionality of the delegation of authority to law enforcement officials to define explosives and classify drugs within the context of the criminal law, *United States v. Gordon,* 580 F.2d 827, 840 (5th Cir.) *cert. den.* 439 U.S. 1051, 99 S.Ct. 731, 58 L.Ed.2d 711 (1978), *United States v. Womack,* 654 F.2d 1034 (5th Cir. 1981) *cert. den.* 454 U.S. 1156, 102 S.Ct. 1029, 71 L.Ed.2d 314 (1982). Furthermore, as the government points out, the commission itself bears the hallmarks of the executive branch. The officers are appointed by the President and are removable by him, see *Bowsher,* 106 S.Ct. at 3186–89, *Humphrey's Executor v. United States,* 295 U.S. 602, 626–32, 55 S.Ct. 869, 873–75, 79 L.Ed. 1611 (1935).

The argument has been made that this approach ignores the fact that bodies such as the commission can easily exercise mixed functions, and rigid classifications such as 'executive' are of little assistance, and in short unrealistic. I appreciate the force of this contention, but it does little to save the United States Sentencing Commission from the instant challenge. If anything the commission exercises powers of a 'legislative—executive' nature. The guidelines formulated by the commission may, under certain circumstances, automatically become law, 28 U.S.C. § 994(*o*), (p). In fact, the only arguably judicial act performed by the commission is its consideration of petitions filed for reduction of sentence under 28 U.S.C. § 994(s).

While, as I have pointed out, the United States Attorney has agreed the functions exercised by the commission are in fact of an executive nature, the commission itself hotly contests this. The commission's arguments prevailed in *United States v. Ruiz–Villaneuva,* where the court reasoned as follows. First, it looked to the designation afforded by Congress of which the court asserted '[t]his is language which while not conclusive, nevertheless must be afforded the considerable deference normally owing to congressional determinations', at p. 1419. Second, it examined the Senate Reports which evidenced, the court maintained, a clear determination to locate the commission in the judicial branch. Then the court examined the line of cases beginning with *Hayburn's Case* which consider the concept of judicial function. It concluded the Act did not unconstitutionally allocate power to either the three Article III judges sitting on the commission or the judicial branch as a whole. The court asserted 'the work of the commission. . . . [is] . . . in aid of the judicial function'.

I disagree for a number of reasons. First, excessive reliance was placed upon Congress' labelling of the commission and its intent in so doing as evidenced by the Senate Reports on the issue. This avoids

the lines of the Federal Trade Commission or the Securities and Exchange Commission.

the clear direction given by the Supreme Court in *INS v. Chada*, above. It ignores the fact Congress cannot salvage an otherwise unconstitutional statute by its determination to impose a particular label on a function. It eschews, more importantly, the overriding role of the courts in supervising that doctrine; it serves to ignore the prohibition against compromising 'the authority or responsibility of [the] court as the ultimate expositor of the constitution', *Glidden Co. v. Zdanok*, 370 U.S. 530, 542–543, 82 S.Ct. 1459, 1468–1469, 8 L.Ed.2d 671 (1962) (Harlan J.).

Second, *Ruiz–Villaneuva* preoccupies itself with examining the question not of the actual character of the function exercised by the commission and its relationship with the traditional allocation of power between the branches of government, but instead with whether the function exercised by the commission might constitutionally be exercised by Article III judges. This absence of consideration of the actual nature of the powers exercised by the commission renders the decision unpersuasive. In any event I regard the conclusion that Article III judges may constitutionally exercise these powers as most probably incorrect.

The further argument was raised that because the commission's functions are in aid of the judicial branch, they may be delegated to a body within the judicial branch. This contention may have a superficial appeal, but on closer consideration it is revealed as grossly mistaken. First, Article III courts are the ultimate arbiters of all laws within the United States. The panoply of commissions, legislating bodies and traditional executive committees which could under such a tender formula be admitted into the judicial branch is terrifying.

Second, it confuses the fact that the ultimate inquiry in a matter of this nature is not as much to the area of expertise with which a body is concerned, but with the part in the process of government that body occupies in facilitating that eventual aim. Here, the sphere of operation imposed upon the commission by the Sentencing Act makes the conclusion ineluctable that those powers are indeed executive in nature. An exception to this principle may well exist with regard to the functions exercised by the Administrative Office of the United States Courts, or the Judicial Conference or the Advisory Committee on the Federal Rules of Civil Procedure but these are exceptions which come within the clear proviso facilitated by the Supreme Court for rules which regulate procedure—'the judicial process for enforcing rights and duties recognized by substantive law and for justly administering a remedy and redress for disregard or infraction of them.', *Sibbach v. Wilson*, 312 U.S. 1, 14, 61 S.Ct. 422, 426, 85 L.Ed. 479 (1941).

■ That this exception must encompass not only the power of the courts to promulgate their own rules but also to establish some system of self-management is clear and logical, *Chandler v. Judicial Council*, 398 U.S. 74, 84–85, 90 S.Ct. 1648, 1653–1654, 26 L.Ed.2d 100 (1970).[23] But to extrapolate the concept that any system of rules of assistance to the judicial function can be formulated by the judiciary themselves and within the shadow of the judicial power is to cross a line from matters of internal management, regulation and mere administrative rules to those of external import or primary rules, which if accepted would wreak havoc on our system of government and render the tripartite separation of powers as otiose in the future as judicial discretion in sentencing has become today.[24] In this regard, the commission

---

**23.** For this reason, reliance by the commission upon *Matter of Certain Complaints Under Investigation*, 783 F.2d 1488 (11th Cir.1986) is misplaced. '[J]udges are not limited to just benchsitting and do not violate separation of powers principles when they participate in ancillary court management tasks', 783 F.2d at 1505. To argue that the formulation of a set of mandatory guidelines to predetermine sentences for ninety percent of the criminal defendants without in the federal judicial system is an 'ancillary court management task' would be like saying the amendment of a statute to clarify a difficult point of statutory interpretation could be made by the judiciary. This is plainly wrong.

**24.** I decline to discuss at length the contention that the guidelines in fact represent a scheme of remedies, rather than negotiating rights, and accordingly may be validly promulgated by the

fails to note the distinction drawn by the Supreme Court in *Miller v. Florida,* — U.S. ——, 107 S.Ct. 2446, 2452–2453, 96 L.Ed.2d 351 (1987) between matters of procedure and punishment, viewing changes of the latter character as 'hav[ing] little about it that could be deemed procedural', *id.*[25]

The misconception under which the commission labors may be highlighted by examining the remarks of one commentator,

> in view of the history of delegations to the judicial branch to promulgate rules and undertake other non-adjudicative functions, it seems rather ahistorical to argue that the function of developing and promulgating standards to guide *judges* in their sentencing discretion is inherently an executive function.

Killian, *The Sentencing Commission: Lost In The Interstices of Separation of Powers,* 34 Fed.B.News & J. 266, 269 (July/Aug. 1987) (emphasis in original).

The point missed here, of course, is that no one is asserting the function of developing standards to guide judges in sentencing is *inherently* executive. It is the function the government has assigned to the Sentencing Commission in this case which is as a matter of law executive. The Sentencing Reform Act imposes upon the commission the function not of promulgating standards which *guide* judges in their sentencing discretion, but the function of formulating rules which must be followed in almost all instances and which effectively deprive the judges of any discretion whatsoever. As the Supreme Court said in *Miller v. Flor-*

*ida* of the sentencing guidelines operating in the respondent state '[n]or do the revised guidelines simply provide flexible 'guideposts' for use in the exercise of discretion; instead they erect a high hurdle that must be cleared before discretion can be exercised ...', 107 S.Ct. at 2453–2454. As such it is difficult to argue the function is anything but purely executive. Further, since this function could properly be entrusted to the executive branch, the presidential power of removal of commission members would pose no constitutional barriers.[26]

### 4. *Holding.*

■ Even a cursory consideration of the role played by Article III judges in the United States Sentencing Commission points to the conclusion that that body is constituted in violation of the principle of separation of powers. I arrive at this conclusion applying the conventional functional analysis of the impact on the judicial branch of government this assignment of executive power entails.

The formal, statutory union of the executive and the judiciary established by the Act radically undermines the concept of an impartial judiciary, free from executive or legislative interference. This commission does not merely rely upon the advice of members of the judiciary to execute legislation.[27] It does not merely facilitate the voluntary involvement on an occasional or infrequent basis of members of the judiciary in such functions. Instead, in what

---

judiciary. Suffice to say that Hohfeld would probably turn in his grave. The analogy the commission makes to Rule 11 of the Federal Rules of Civil Procedure is completely off-beam. This, more than any other Rule is an essential tool in regulating the internal management of cases by a court. See my opinion in *Storage Tech. v. Storage Tech.,* 117 F.R.D. 675, 678 (D.Colo.1987). The finding in *Ruiz–Villaneuva* that offenders are affected by the guidelines 'only in an indirect sense', at p. 1422, strikes me as baffling, not least of all on account of the liberal standing requirements imposed earlier in that case.

**25.** In *Ruiz–Villaveuva,* the court relied upon the imprecise nature of the distinction between matters of substance and of procedure. While this may be so, I observe that in *Miller* the

Supreme Court specifically noted the 'elusive' character of the distinction, while finding specifically that the matter in this regard was clear cut.

**26.** Defendant's argument is dependant in this regard upon the power not being correctly so entrusted, '[t]he structure of the Constitution does not allow the executive to control the making of sentences; it follows that Congress cannot give to the President the control of removal of the Commissioners', (Defendant's brief at p. 39).

**27.** Hence automatically taking this case out of the mold of *Scaduto* and *Scarfo* where the commission in question 'does not prosecute, does not indict and does not legislate', *Scarfo,* 783 F.2d at 380.

can only be termed a flagrant violation of the principle of separation of the judiciary and the executive, it mandates the constant involvement of Article III judges in an ongoing and continuous executive process, 28 U.S.C. § 994($o$), (p), (s). It represents the most patent form of coalition between the judiciary and another governmental branch that was so roundly criticised by the framers when they rejected James Madison's Virginia Plan.

There is no difficulty in determining 'the Intent of the Framers' in this instance. The greater difficulty lies in understanding how such starkly obvious intent could be so blatantly disregarded. As Rufus King observed of the judiciary,

> by being often associated with the executive, they might be induced to embark too far in the political views of that magistrate and thus a dangerous combination might by degrees be cemented between the executive and judiciary departments. It is impossible to keep the judges too distinct from every other avocation than that of expounding the laws. It is peculiarly dangerous to place them in a situation to be either corrupted or influenced by the executive.
>
> Federalist Papers No. 73, at 446–447 (Rossiter ed. 1961).

The direct and blatant collaboration between the judiciary and the other branches of government the Act creates not only serves to tarnish the reputation of the judiciary as independent of and completely divorced from those other arms of government, but also in fact compromises its very independence. Aside from the fact that judges serving on the commission will be in a position whereby the time available to them to discharge their formal judicial functions will be limited on account of their involvement with the commission, aside from the fact they will probably have to recuse themselves from cases involving the construction of the guidelines—and arguably even all criminal cases (which facts in themselves will not in my view suffice to

activate the functional *Nixon* test), the most worrying aspect of the commission's organic structure must be the direct executive control to which commission members submit themselves.

It is conceivable that situations will arise in which judge-members shall be told by the other four members of the commission whether they should spend time in their own courts, or attend commission meetings in Washington. The Act thus forces a direct involvement by the judiciary in the executive process. It results in a situation whereby the work of the commission is imprinted with the hallmark of members of the federal judiciary long before it is the subject of consideration by any court of law, with the associated difficulty faced by other judges in interpreting and applying their work.

It involves these judges in considering not only matters of policy involving the broadest aspects of our criminal justice system, but may also involve their participating directly with the legislature in political issues of greater significance. Already, for example, it seems clear it will have to at some stage delve into the highly charged issue of the death penalty.

The judges on the commission are charged with tasks which include training, in their capacity as members of the executive, other members of the judiciary, in their capacity as judges, in the use of the guidelines, 28 U.S.C. §§ 995(a)(12)(B), (17) and (18). Those judge members of the commission have conducted such training sessions.[28]

That this cementing of the judiciary and the executive extends in its implications far beyond the realms of those individual judge-commissioners is further clear when one considers these judges are not merely selected by the executive, but are chosen from a list of six names furnished by the Judicial Conference, which is chaired by the Chief Justice, 28 U.S.C. § 991(a), thereby increasing the difficulty facing sitting

---

**28.** For example, Judge McKinnon spoke at the National Institute of Justice in Phoenix, Arizona in September. Judge Breyer has spoken at the recent Judicial Conferences of the Seventh and Fifth Circuits.

judges who must evaluate and impartially apply these guidelines.

The overriding consideration to be borne in mind when approaching a separation of powers problem such as the instant one, is that the nature of the doctrine and in particular the gloss imposed upon it by the functional analysis of *Nixon* is such that inevitably, the application of the principle demands a court to engage in a certain amount of line drawing. This is not a matter which can be conveniently defined by 'empirical evidence' of functional impairment, as the court in *Chambless* sought to do, at p. 799. The fundamental inquiry is to the totality of the circumstances. This is a fact the government overlooks in its brief.

The government argues, correctly, that the mere fact of minor disruption within the federal courts as a result of the judge-commissioners having to recuse themselves from a number of cases will not operate in itself to violate the separation of powers doctrine. The government points out that the judges who sit on the commission cannot be forced to do so, and relying upon the discussion of voluntariness in *Scarfo*, maintains this fact renders the allocation of executive functions to those judges constitutional.

But where the government errs is in its failure to stand back and view in broader terms the union created not just between the judge-commissioners and the executive, but between the judiciary and the executive as a whole. No effort is made by the government to explain the impact of the decision and broad assertions in *Re Sealed Cases* to the instant facts. No effort is made to discuss the impact on the judiciary's general appearance of impartiality.[29]

As the court noted in *Re Sealed Cases*, the essence of a neutral judiciary is that it be 'involved in neither the creation nor execution of [the] law', at p. 489. The fundamental truth remains that here, as in *Re Sealed Cases*, '[t]he judiciary is, under the Act implicated directly in Executive Branch policy judgments', at p. 516. For this reason the government's list of instances of judges who have voluntarily participated in the workings of other arms of government is irrelevant. As I shall discuss shortly, whether these individualized examples were constitutionally proper or not, none of them involved judges who so participated by statutory mandate.

The government argues that the President could not force any judge to sit on the commission. So stated this is correct, but the commission *must* include three federal judges. If no judge would join the commission, it could not operate. Judicial participation is by statute a precondition to the commission's existence. The difference in impact on the judicial body as a whole between this fact and that of voluntary participation by individual judges in executive government on a once and sporadic basis is easy to appreciate. For this same reason, the emphasis sought to be placed upon the fact the judges on the commission serve not in their judicial capacity and the fact 'the judges do not wear their robes in the Commission room', *Scaduto*, 763 F.2d at 1204, is unhelpful.

■ The government has sought to make a great deal of the historical examples cited above of judges participating on government commissions in favor of its contention that this act is not unconstitutional. Because in the instant case I have found a functional violation of the principle, I do not need to examine in great depth the problem of individual judges assuming such tasks. Nonetheless, here again, the examples are misplaced.[30] First, as I have

---

**29.** The government's *ipse dixit* claim that the public would not find it objectionable to have judges involved in formulating guidelines for sentencing furnishes a deceptively simple way around this problem. The appearance of impartiality, of course, springs not from the content of the substantive laws the commission executes, but from the fact of judges being in-

volved in their execution in the first place, see *Re Sealed Cases*, at p. 516. As I point out *infra.* analogies to judicial rule-making in aid of efficient court administration are inaccurate.

**30.** The same error, albeit in a different form, is perpetrated by the commission which seems to wish to argue—notwithstanding the clear lan-

pointed out, because they do not furnish anything near an unbroken pattern. Second, because few of these examples ever became the subject of constitutional challenge. Where they did—as in *Scarfo* and *Scaduto*—the violations of the separation of powers principle was so minor, so contained and so limited in its effect that little real harm could be perceived. One might not find it particularly disturbing that once upon a time one sitting Supreme Court Justice was also an ambassador and representative of the executive abroad, but if a statute existed mandating such or if one Supreme Court justice has always occupied such a position, considerable grounds for concern as to the true extent to which the executive and judiciary operate independently of each other would exist. Here, however, the nature of the functions exercised by the commission, its continuing nature and unequivocal statutory basis places this instance in a completely different league.

In short, the formal relationship established by the Sentencing Reform Act of 1984 between the executive and the judiciary is of such a nature that functionally it adversely impacts the judicial arm of government by first in fact tarnishing the independence of the judiciary and second substantially impairing the essential appearance of impartiality which is the hallmark of this branch of government. I can perceive no substantial justification for this violation of the principle of separation of powers. Accordingly, I hold the Act is unconstitutional.

## IV DELEGATION OF POWERS

It is axiomatic that Congress may not delegate its legislative power to other branches of government. In exercising that power, however, Congress clearly may draw upon the assistance of the other branches. In only two cases has the Supreme Court declared a statute unconstitutional on the grounds of undue delegation of legislative power. In both *A.L.A. Schechter Poultry Corporation v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935) and *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935), the court struck down portions of the National Industrial Recovery Act of 1933.

The section at issue in *Panama Refining* authorized the President to make illegal any shipments of petroleum products in excess of the amount facilitated by state authority. The section was declared unconstitutional on the basis of the open ended power the President was given to determine the scope of the prohibition. As the court asserted, the section gave 'to the President an unlimited authority to determine the policy and to lay down the prohibition, or not to lay it down, as he may see fit', 293 U.S. at 415, 55 S.Ct. at 246. This was not a case in which the executive was left to 'fill up the details under the general provisions made by the legislature', *id.* at p. 426, 55 S.Ct. at p. 251, citing *Wayman v. Southard supra.*, but which instead invested the President with 'an uncontrolled legislative power'.

In *Schechter Poultry*, the statute permitted the President to approve codes of fair competition for an industry. 'fair competition' was not, however, defined anywhere in the statute. Here, again, the provision was struck down. Congress had not 'established the standards of legal obligation', 295 U.S. at 530, 55 S.Ct. at 843. The President was presented by the Act with a near unfettered discretion to promulgate the codes.

Apart from these two cases, the court has adopted an approach to the delegation

---

guage in *Buckley v. Valeo*, that 'executive or administrative duties of a non-judicial nature may not be imposed upon *judges* holding office under Article III', 424 U.S. at 123, 96 S.Ct. at 684 (emphasis added), and despite similar clear references to *judges* in *Re Sealed Cases*—that Congress can call upon judges in their individual capacities to do anything Congress sees fit. This not only represents a failure to view the matter in suitably broad terms, but represents the very error I mentioned above of refusing to appreciate the issue of judges performing non-judicial functions is itself inseparable from the separation of powers issue. The point is that judges may not undertake non-judicial tasks, in their personal capacities or otherwise, if to do so raises the spectre of a violation of our tripartite system of government.

of legislative power which, to phrase it broadly, will uphold the validity of such delegation once the discretion of the delegatee is in some way circumscribed, either through being forced to operate within defined policy limits or through being hemmed in by congressionally mandated parameters. A delegation of power is constitutional 'if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority', *American P & L Co. v. SEC,* 329 U.S. 90, 105, 67 S.Ct. 133, 142, 91 L.Ed. 103 (1946).

The ease with which Congress, once keeping within these guidelines, may delegate in order to assist the execution of its legislative power, is clear from a consideration of a number of authorities in which such delegation has been held to be permissible. In *American P & L* the delegation to the SEC of the authority to ensure corporations do not unduly complicate their structure or unfairly distribute voting power among security holders was upheld as valid. In *Lichter v. United States,* 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948) the delegation of power to enact standards that would permit recovery of excessive profits was held permissible. In *New York Central Securities Corporation v. United States,* 287 U.S. 12, 24, 53 S.Ct. 45, 48, 77 L.Ed. 138 (1932) the delegation of the ability to facilitate consolidation of carriers when in the public interest was also found constitutionally sound. In *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944) the Supreme Court permitted the Federal Power Commission to establish just and reasonable rates for natural gas.

Nonetheless, the delegation doctrine has not by any means disappeared from our jurisprudence. The Supreme Court restated it in the following terms in 1974,

If Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to fix such rates is directed to conform, such legislative action is not a forbidden delegation of legislative power.

*National Cable Television Association, Inc. v. United States,* 415 U.S. 336, 342, 94 S.Ct. 1146, 1150, 39 L.Ed.2d 370 (1974).

Here, the standards delineated by Congress are sufficient to justify the inference that the delegation is in fact constitutional. The statute sets forth not only the policy considerations to be applied in drawing up the guidelines, 28 U.S.C. § 991(b)(1)(B), but the commission is further presented with a clear indication of the parameters of the discretion within which it is to operate when drawing up those guidelines, see *Geraghty v. United States Parole Commission,* 719 F.2d 1199, 1213 (3rd Cir.1983). The purposes of sentencing were set out in full, 18 U.S.C. § 3553(a), 28 U.S.C. § 991(b)(1)(A). The commission was told not only the type of factors to be accounted for in determining the different classes of defendants, but was also furnished with clear directive as to the classes of offenses to be considered, 28 U.S.C. § 994(c)(1)–(c)(7), § 994(d)(1)–(d)(11).

As the court pointed out in *Ruiz–Villaneuva,* 'Congress disclosed to the Commission both the "whither" and the "why" of sentencing reform', at p. 1417. Not only this, but in a number of instances the exact punishment to be allotted to specific offenses is delineated. The commission is furnished with maximum penalties for crimes, 28 U.S.C. § 994(b). These statutory mandates provide the commission with perfectly adequate indications of the policy behind and scope of their functions. Clearly, more stringent conditions could have been imposed upon the commission. Defendant goes to considerable lengths to emphasize these shortcomings. However, this is a feature of almost all delegation problems.

The relevant inquiry before this court is not whether the statute could have been more detailed in its delineation of the commission's role, but whether the statute lays down an intelligible principle for guiding the use of that discretion. As the court stated in *Yakus v. United States,* 321 U.S. 414, 426, 64 S.Ct. 660, 668, 88 L.Ed. 834 (1944), it is only if there is an 'absence of

standards' that a statute should be invalidated on this ground.

## V SENTENCING UNDER THE GUIDELINES—SOME FURTHER OBSERVATIONS

There are a number of further problems with this Act which must be highlighted, but which have not been raised by defendant in the instant challenge. First, this has been a broadly based challenge to the statute and the parties have, perhaps wisely, avoided discussing the constitutionality of specific provisions. Nothing in this opinion should be interpreted as affirming the validity of any specific provisions of the statute. In fact as I look at the Act, a number of sections appear to me to be of doubtful validity. I have extreme doubts about the propriety of non-Article III judges adjudicating petitions to. modify the guidelines utilized in a defendant's sentencing as provided for in 28 U.S.C. § 994(s). As I read *United States v. Benz*, 282 U.S. 304, 311, 51 S.Ct. 113, 115, 75 L.Ed. 354 (1931), the reduction of a sentence by altering the underlying judgment is a judicial function,

> The judicial power and the executive power over sentences are readily distinguishable. To render judgment is a judicial function. To carry the judgment into effect is an executive function. To cut short a sentence by an act of clemency is an exercise of executive power which abridges the enforcement of the judgment, but does not alter it *qua* judgment. To reduce a sentence by amendment alters the terms of the judgment itself and is a judicial act as much as the imposition of the sentence in the first instance.

 It appears to me that this is exactly what the section authorizes. As such, it must be effected by an Article III court, *Northern Pipeline v. Marathon Pipe Line*, 458 U.S. 50, 58–60, 102 S.Ct. 2858, 2864–2866, 73 L.Ed.2d 598 (1982), and see *Booth v. United States*, 291 U.S. 339, 350, 54 S.Ct. 379, 380, 78 L.Ed. 836 (1933) cited

above. I have doubts whether the obligation imposed upon judges who deliver sentence under the guidelines to 'submit to the Commission in connection with each sentence imposed a written report of the sentence, the offense for which it is imposed, the age, race and sex of the offender, information regarding factors made relevant by the guidelines, and such other information as the Commission finds appropriate.', by § 994(w) represents an administrative chore that is 'reasonably incidental' to the judicial function of imposing sentence, as required to save it from the case and controversy requirement. I have considerable doubts regarding the compatibility of § 992(c), concerning the remuneration of judge-commissioners, with the Continuance Clause of Article III, Section 1.

I have reservations as to whether the Sentencing Guidelines themselves are valid in all respects when matched against the requirements of the statute. This point was raised before the court in *Chambless* insofar as the issue of whether the requirement that a period of supervised release be imposed in all felony cases was compatible with the Act. The court dismissed this argument summarily, but I think it presents a more substantial ground of challenge. There are other problems. In particular, I am concerned by the effective abolition of probation and other extant alternatives to long terms of imprisonment by the guidelines. Notwithstanding 18 U.S.C. § 3582(a) specifically posits that 'imprisonment is not an appropriate means of promoting correction and rehabilitation'. See also 18 U.S.C. § 3561(a).[31]

I am concerned with the impact the guidelines have on traditional notions of federalism. There is an almost insoucient disregard for the disparity between state sentences and federal guideline sentences for the same offense. Regional differences are ignored. For example, bank robbery can be prosecuted in either state or federal court. In both this federal district and the State of Colorado, such crimes yield sen-

---

**31.** See further Weinstein, *The Role of Attorneys Under the New Sentencing Guidelines*, NYLJ

12/16/87.

tences much more severe than the guidelines permit. The guidelines seem exclusively concerned with a rigidity that admits of no ambiguity. Yet a determination of the reality and history of both events and criminal behavior must involve considerations of the differences of locale and culture. Some of these phenomena are inchoate though readily ascertainable by those having direct contact with the crime, the criminal and the victim.

My strongest concern is of a more general nature and springs from what I personally regard as more fundamental objection to the new sentencing process. In this opinion, I declare the Act unconstitutional on comparatively narrow grounds. I find the legislature has validly delegated to the executive the power to promulgate guidelines for the use of federal courts in sentencing defendants. The Act, however, violates the principle of separation of powers by requiring in the membership of the sentencing commission, three federal judges. This enables me to avoid addressing directly the question of whether the incredibly detailed scheme those guidelines represent constitutes in and of itself an oppressive chilling of judicial discretion in sentencing. Nonetheless, I am anxious to make a number of comments.

In my view a colorable argument can be made that the scheme itself serves to erode and undermine the function of the judiciary within our legal system. The parties have argued this point only peripherally. The whole process of sentencing demands a delicate distribution of power amongst the three arms of government. As I have pointed out at disconcerting length above, the determination of the sentence for a particular offense is a legislative function. The imposition of sentence is clearly a judicial function. In this regard it is said to be no different from the rendering of any other judgment, *United States v. Benz*, 282 U.S. 304, 311, 51 S.Ct. 113, 115, 75 L.Ed. 354 (1931). As such, there is a fine line between the two aspects of the process. The legislature may clearly specify a mandatory sentence for an offense. The legislature may, at least according to current jurisprudence, delegate to the executive

some of its functions in this regard. But at some point the place of the judiciary within the process must be accounted for and a line must be imposed.

Placing the sentencing process within the three limbs of government remains an extremely difficult task. There is little indication within our own jurisprudence as to how exactly the functions should be distributed. Defendant has pursued a somewhat absolutist line, claiming the prescription of punishment is a judicial function. This simply put is not the case. Neither is the matter concluded by blithely responding that the legislature may impose a mandatory sentence and the legislature may delegate its power to devise sentences and accordingly the scheme here is worry-free. The problem requires a more serious response.

The following observation by Chief Justice O'Dalaigh of the Supreme Court of Ireland is particularly pertinent,

There is a clear distinction between the prescription of a fixed penalty and the selection of a penalty for a particular case. The prescription of a fixed penalty is the statement of a general rule, which is one of the characteristics of legislation; this is wholly different from the selection of a penalty to be imposed in an individual citizen's case; it states the general rule, and the application of that rule is for the Courts. If the general rule is enunciated in the form of a fixed penalty then all citizens convicted of the offense must bear the same punishment. But if the rule is stated by reference to a range of penalties to be chosen from according to the circumstances of the particular case, then a choice or selection of penalty falls to be made. At that point the matter has passed from the legislative domain. Traditionally, as I have said, the choice has lain with the Courts. Where the Legislature has prescribed a range of penalties the individual citizen who has committed an offense is safeguarded from the Executive's displeasure by the choice of penalty being in the determination of an independant judge. The individual citizen needs the

safeguard of the Courts in the assessment of punishment as much as on his trial for the offence. The degree of punishment which a particular citizen is to undergo for an offence is a matter vitally affecting his liberty; and it is inconceivable to my mind that a Constitution which is broadly based on the doctrine of separation of powers ... could have intended to place in the hands of the Executive the power to select the punishment to be undergone by citizens. It would not be too strong to characterize such a system of government as one of arbitrary power. *Deaton v. The Attorney General*, [1963] I.R. 170, 180.

This statement of principle commands support throughout other common-law jurisdictions. It was applied by the Privy Council in *Hinds v. The Queen*, [1977] A.C. 198. The court asserted,

> Parliament, in the exercise of its legislative power, may make a law imposing limits upon the discretion of the judges who preside over the courts by whom offenses against that law are tried to inflict on an individual offender a custodial sentence the length of which reflects the judge's own assessment of the gravity of the offender's conduct in the particular circumstances of the case. What Parliament cannot do, consistently with the separation of powers, is to transfer from the judiciary to any executive body whose members are not ... [judicial officers] ... a discretion to determine the severity of the punishment to be inflicted upon an individual member of a class of offenders.

[1977] A.C. at 226.

And see further, *Liyanage v. The Queen*, [1967] 1 A.C. 259,

Of course, under the Sentencing Reform Act, the executive in theory does not determine the sentence for a particular defendant. But a line must exist, a border must be drawn between situations where the executive is given the power to determine broad categories of defendants on the one hand, and those where the classes drawn up are so narrow, so specific, where the judges discretion is so paralysed that the executive is in effect determining individual sentences. Where this occurs, no technical appellation for what happens will save the process from its tyrannical reality. If the Sentencing Commission Guidelines have not yet reached this stage, they come extremely close to it, and indeed seem destined to reach it in the future.

I am anxious to place my views here in the context of what I have said above in section III part 3 A., for I can understand how one might initially feel these assertions conflict. I am not casting any doubt upon my previous holding that the legislature may validly delegate to the executive the power to draw up general guidelines to assist judges in making sentencing decisions. I think my argument is more sophisticated. I am asserting that those guidelines, once drawn up, must not result in a situation where in fact each individual coming before a court for sentencing has his own sentence predetermined by a non-judicial body. The fragile balance involved is well illustrated by the remarks of the Supreme Court in *Ex Parte United States*, 242 U.S. 27, 41–42, 37 S.Ct. 72, 74, 61 L.Ed. 129 (1916),

> Indisputably under our constitutional system the right to try offenses against the criminal laws and upon conviction to impose the punishment provided by law is judicial, and it is equally to be conceded that in exerting the powers vested in them on such subject, courts inherently possess ample right to exercise reasonable, that is, judicial, discretion.... indisputable also is it that the authority to define and fix the punishment for crime is legislative and includes the right in advance to bring within judicial discretion ... elements of consideration which would be otherwise beyond the scope of judicial authority ...

Nor would such a scheme be saved by having it comprised completely of federal judges once, as explained above, its fundamental nature remained executive.

This concern springs from the right of every citizen convicted of an offense to have his punishment determined by a judge from within the parameters laid down by

Congress, and his correlative right not to have the choice predetermined in his individual case by a non-judicial body. As the Supreme Court asserted in *Tumey v. Ohio,* 273 U.S. 510, 533–534, 47 S.Ct. 437, 444–445, 71 L.Ed. 749 (1927), a judge 'is given the judicial duty first, of determining whether the defendant is guilty and second having found his guilt to measure his punishment'.

There is a flip side to this contention. Justice Cardozo once asserted,

From the beginnings of our history, the principle has been enforced that there is no inherent power in the Executive or Legislature to charge the judiciary with administrative duties except where reasonably incidental to the fulfillment of judicial duties.

*In Re Richardson,* 247 N.Y. 401, 410, 160 N.E. 655 (1928)

In *Muskrat v. United States,* 219 U.S. 346, 356, 31 S.Ct. 250, 253, 55 L.Ed. 246 (1911) the Supreme Court posited the following definition of judicial power,

"Judicial power," says Mr. Justice Miller in his work on the Constitution, "is the power of a court to decide and pronounce a judgment and carry it into effect between persons and parties who bring a case before it for decision" Miller Con.St. 314.

In *Youngstown Sheet and Tube Company v. Sawyer,* 343 U.S. 579, 594, 72 S.Ct. 863, 889, 96 L.Ed. 1153 (1952), Justice Frankfurter concurring defined it in the following terms,

Judicial power can be exercised only as to matter that were the traditional concern of the courts at Westminster and only if they arise in ways that to the expert feel of lawyers constitute 'cases' and 'controversies'.

I strongly question whether the rigid calculations a judge must administer and follow in the case of each defendant under this scheme is commensurate with any of these descriptions of judicial power. I strongly question whether a detailed scheme of the nature of these guidelines really amounts to no more than a general mandatory sentence, or whether it amounts in fact to a predetermination of each individual's sentence by a body other than the judiciary. I strongly question whether these guidelines are designed to assist a judge in making the most difficult of decisions, or whether it amounts to a legislative instruction as to how those decisions must be made. In short, I strongly doubt whether this scheme, even if stripped of its technical deficiencies can pass general constitutional muster. If it can, then I strongly doubt the continued vitality of principles of judicial independence, fairness of procedure and individual justice for individual citizens. These are concepts, I fear, which no computer data banks can comprehend.

It is hereby ORDERED, defendant's motion to declare the Sentencing Reform Act of 1984 unconstitutional is GRANTED.